UNITED STATES of America, Appellee,

v.

Fred Andrew STEELE, Appellant.

No. 79–1559.

United States Court of Appeals,
Eighth Circuit.

Submitted Oct. 12, 1979.

Decided Nov. 30, 1979.

David M. Lurie, Lurie & Jaco, Kansas City, Mo., for appellant.

Michael A. Jones, Asst. U. S. Atty., Springfield, Mo., for appellee; Ronald S. Reed, Jr., U. S. Atty., Springfield, Mo., on brief.

Before LAY, HEANEY and HENLEY, Circuit Judges.

LAY, Circuit Judge.

Fred Andrew Steele was convicted of second degree murder, a violation of 18 U.S.C. § 1111, arising from the stabbing death of a fellow inmate one Joseph Jackson, at the Federal Medical Center Detention Facility at Springfield, Missouri. There exists no dispute that Steele did the stabbing; at trial Steele claimed he acted in self-defense. On appeal, the defendant urges the trial court erred in refusing to suppress certain statements given to the prison guards, a fellow inmate, and F.B.I. agents following the stabbing. We affirm the judgment of conviction.

Immediately following the stabbing, Steele, fearing violent retaliation from other inmates, surrendered to one of the guards. Steele admits stating to the guard, "I stabbed a nigger in the rec shack." He concedes that this statement was voluntary and admissible. He contends, on appeal that subsequent statements to the guards and others contained incriminating statements which should have been suppressed since he was not given the warning required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). He further contends that although he voluntarily gave subsequent statements to F.B.I. agents after receiving *Miranda* warnings, that the "cat was out of the bag" and these statements should have been suppressed under *Miranda v. Arizona, supra* at 494–97, 86 S.Ct. 1602. Concomitant with these challenges is the argument that Steele was questioned by the authorities subsequent to the time he requested counsel be appointed.

The record demonstrates the government's direct examination of the guards solicited only Steele's original spontaneous and voluntary statement which was repeated to another guard and an inmate and

a statement concerning the location of the victim. The other statements made by Steele to the guards were brought out by Steele's counsel on cross-examination in an attempt to bolster Steele's claim of self-defense.[1] It is fundamental that where the defendant "opened the door" and "invited error" there can be no reversible error. *United States v. Drake*, 542 F.2d 1020, 1022 (8th Cir. 1976), *cert. denied,* 429 U.S. 1050, 97 S.Ct. 762, 50 L.Ed.2d 766 (1977).

After Steele was placed in a segregation unit, F.B.I. agent Bruce Bradford came to the Center to investigate the stabbing. Bradford interviewed Jackson, who at the time was still alive and then questioned Steele. Before doing so Bradford introduced himself as an F.B.I. agent and asked Steele if he could read. Steele, who has a B.S. degree from Ball State University, read the form which contained the *Miranda* warning and signed it. Once Steele had signed the card, Bradford continued with the interview. Steele told Bradford that Jackson had pressured him to perform homosexual acts. Steele then told Bradford that he had invited Jackson to step outside the rec shack so, "We can settle this matter now." Steele also said that Jackson was "naive" enough to think I was going to submit to sex and that he was naive enough to lead the way out with Steele following. Steele told Bradford that he hit Jackson as hard as he could with a knife in the hallway leading into the recreation shack. Steele then showed Bradford how he stabbed Jackson. He described how the blow had knocked Jackson 15 to 20 feet.

Bradford's description of the interview continued with other details of what occurred: (1) Where the knife had come from; and (2) what Steele had done with the knife. Bradford testified that Steele said, "[H]e got what he deserved; I hope he dies." Steele then indicated to Bradford what his defense would be. He said, "I heard about this homosexual defense and that's what I plan to use." Steele described the case as one in which an inmate had escaped from prison and then defended his actions claiming he was forced to escape because of homosexual pressure.

The following morning, March 17, 1979, Bradford returned to the Center to get a written statement from Steele. By this time Jackson had died. Bradford was in the process of explaining to Steele why he had returned when Steele said, "The son-of-a-bitch died, this changes everything." Steele then asked, "Mr. Bradford, the interview last night, did you record the interview?" Bradford responded, "No, I did not, simply made a few notes." Then Steele said, "Well, in that case I probably won't be able to remember what I said last night." At that point Bradford felt that the interview should be terminated and he did not question Steele further.

The Government also called F.B.I. agent Paul Van Someren as a witness. Van Someren interviewed the defendant on March 21, 1979. He gave Steele the standard *Miranda* warning card to read before the interview and asked Steele to read and sign the card, which he did. Van Someren's basic purpose in interviewing Steele was to determine if there were persons other than Steele involved in the stabbing. When asked if he had received any assistance Steele said, "No other inmate gave me the knife. I obtained the shank through my own efforts." He later said, "No other inmate is involved."

The defendant testified on his own behalf. He told his story, admitting that he stabbed Jackson but claimed that he did so in self-defense. Steele claims that Jackson pulled the knife on him and he took it away from Jackson and stabbed him.

Steele, on direct examination, admitted telling Freeman, the first guard he encountered after the incident, that he had stabbed someone. He also admitted mak-

---

1. On cross-examination of guard Freeman, the defense elicited self-serving statements made by Steele to the guard to the effect that Steele had been harassed sexually by Jackson earlier in the day of the stabbing. The defense's purpose in eliciting this testimony was to lay a foundation for claims of additional sexual harassment of defendant by the victim immediately prior to the stabbing which defendant claimed was in self-defense.

ing the same statement to Spellman, another guard, and Bradford. When asked why he didn't tell Bradford immediately that he had struck Jackson in self-defense, Steele indicated that he was following the unwritten prison code not to "fink" on a fellow inmate. All that changed when Jackson died, which is why he made a statement to that effect.

The record reveals Steele's request for an attorney came after his first interview with Bradford.[2] Bradford went to see Steele the following morning but before he could explain why he was there or give Steele the *Miranda* warning, Steele made some incriminating comments. Bradford immediately discontinued the interview. Several days later agent Van Someren spoke with Steele but before doing so gave him a standard F.B.I. *Miranda* warning card which Steele signed. Steele did not request an attorney at this time even though he obviously knew that he could do so. *See United States v. Williams*, 503 F.2d 480, 485–86 (8th Cir. 1974).

 In the present case defendant's voluntary and spontaneous statement to the guards and the fellow inmate corroborated two eyewitnesses, who testified as to the circumstances surrounding the stabbing. The testimony of the eyewitnesses preceded the agent's statements which did not contradict the subsequent testimony of the defendant himself. Steele's statements made to the agents merely corroborated the only defense he could avail himself of under the circumstances. Even assuming there may have been a violation of the *Miranda* rule in the guards' further questioning of Steele[3] thus, at least arguendo, tainting subsequent statements to the F.B.I. agents, in view of the defendant's proffered theory of self-de-

fense, the solicitation of the defendant's self-serving statements to the guards on cross-examination, and the overwhelming evidence surrounding the crime, we view the admissibility of all of the admitted statements to be harmless error. *Harrington v. California*, 395 U.S. 250, 254, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969).

JUDGMENT AFFIRMED.

---

2. Steele's testimony revealed that he had talked to Bradford the morning after the stabbing. It was at that time that he requested an attorney.

> Q: All right, sir. And did Mr. Bradford start to advise you of your rights again?
> A: He did.
> Q: Did you advise Mr. Bradford at that point that you wanted a lawyer?
> A: I most certainly did.
> Q: All right, sir. And did that conclude that interview?

> A: Yeah. Mr. Bradford did not attempt to pursue any interview in the face of my advising him that I wanted an attorney.

3. We note that the district court was aware of the possibility of *Miranda* violations and minimized their impact by excluding testimony by Lt. Lange concerning the location where defendant had left the knife. Thereafter, the Government withdrew Lt. Lange as a witness without asking him any questions.