# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 00-1618

_____

| | |
|---|---|
| United States of America, | * |
| | * |
| Appellee, | * |
| | * |
| v. | * |
| | * |
| Cornelius Peoples, | * |
| | * |
| Appellant. | * |

_____

No. 00-1658

_____

Appeals from the United States
District Court for the Western
District of Missouri.

| | |
|---|---|
| United States of America, | * |
| | * |
| Appellee, | * |
| | * |
| v. | * |
| | * |
| Xavier Lightfoot, | * |
| | * |
| Appellant. | * |

_____

Submitted: November 16, 2000

Filed: May 18, 2001

_____

Before WOLLMAN, Chief Judge, McMILLIAN, and RICHARD S. ARNOLD, Circuit
Judges.

_____

WOLLMAN, Chief Judge.

Cornelius Peoples and Xavier Lightfoot were convicted of aiding and abetting
the murder of a federal government witness in violation of 18 U.S.C. §§ 1512(a)(1)(A),
1512(a)(1)(C), 1512(a)(2), and 1111.  The district court sentenced each of them to life
imprisonment without the possibility of parole.  Both defendants appeal their
convictions.  We reverse and remand for a new trial.

**I.**

In December of 1997, Lightfoot was arrested and charged with the robbery of
a federally insured credit union in Omaha, Nebraska, based on information supplied by
Jovan Ross, who shared a house with Lightfoot.  Ross had met with state and federal
law enforcement officers in early December of 1997.  Federal Bureau of Investigation
(FBI) agents executed a search warrant for the Ross-Lightfoot house on December 11,
1997, and recovered items taken from the Omaha credit union.  Lightfoot was held at
a private pretrial detention facility operated by the Corrections Corporation of America
(CCA facility), where he remained at all times relevant to this case.  Through the
discovery process in the robbery case, Lightfoot learned of Ross's cooperation with
law enforcement.  Shortly before Lightfoot's trial was scheduled to begin, Ross was
murdered.

The government's theory at trial was that Lightfoot and Peoples entered into a
contract to pay unknown persons to kill Ross because he was providing information
about Lightfoot's criminal activity to law enforcement.  Although Ross had no
substantial information implicating Peoples in criminal activity, the government argued
that Peoples believed that his involvement would be discovered if Ross continued to

cooperate with law enforcement. The government further argued that Peoples and others had robbed a jewelry store in St. Joseph, Missouri, to obtain funds to pay the killers. At trial, the government offered into evidence recordings of conversations between Lightfoot and Peoples that occurred while Lightfoot was incarcerated at the CCA facility.

On appeal, the defendants contend that the district court erred in empaneling an anonymous jury, in denying their motions for mistrial following an allegedly prejudicial statement by the government prosecutor, and in admitting certain testimony.

## II.

### A. Improper Statement by Prosecutor

The defendants contend that the district court erred by denying their motions for mistrial based on an improper statement made by the prosecutor. We review the denial of motions for mistrial for abuse of discretion. United States v. Wadlington, 233 F.3d 1067, 1077 (8th Cir. 2000). A mistrial is called for when the prosecutor's remark was both in fact improper and "'prejudicially affected the defendant['s] substantial rights so as to deprive [him] of a fair trial.'" Id. (quoting United States v. Figueroa, 900 F.2d 1211, 1215 (8th Cir. 1990) (citations omitted)).

During trial, a government witness testified about a statement that Ross had made to him. After defense counsel made a hearsay objection, the prosecutor asserted that the defendant had "murdered the witness" (referring to Ross), and that therefore the statements were admissible under Federal Rule of Evidence 804(b)(6), which allows the admission of hearsay evidence of the statements of an unavailable declarant against a party who caused the unavailability through wrongdoing. After overruling the hearsay objection, the district court instructed the jury that the statement had been

admitted conditionally and that its ruling did not mean that the court believed that the defendants had caused Ross to be murdered.

We conclude that the prosecutor's remark was not improper, because it merely reiterated the government's theory of the case and provided legal support for the admissibility of the proffered statement. Even if the remark was improper, we are satisfied that the court's instruction was sufficient to cure any potential unfair prejudice. Accordingly, the court did not abuse its discretion in denying the motions for mistrial.

## B.  Anonymous Venire Panel and Jury

The defendants contend that the district court erred in empaneling an anonymous jury. Upon request, a person charged with a capital offense must be provided with a list of the names and places of residence of each member of the venire panel at least three days prior to trial, unless the court finds by a preponderance of the evidence that providing the list may jeopardize the life or safety of any person. 18 U.S.C. § 3432 (1994). The district court has wide discretion to empanel an anonymous jury if it finds that a person's life or safety is in jeopardy, or to require the use of numbers for identification in any case. United States v. Darden, 70 F.3d 1507, 1532 (8th Cir. 1995).

All parties were provided a list of the names and places of residence of each member of the venire panel prior to trial. The court then ordered that the panel members be identified in court by numbers rather than by name. The court explained to the panel that this procedure was being employed to reduce the possibility that the media or others interested in the issues of this case might try to contact them.

We find the defendants' argument that the district court acted inappropriately to be without merit. The district court followed the procedures outlined in 18 U.S.C. § 3432, and the defendants point to no legal authority requiring any further disclosure or

-4-

prescribing any procedure for addressing members of the venire panel. The district court's explanation to the panel was reasonably calculated to ensure that the use of numbers did not cause undue prejudice. We approved a similar statement in Darden. 70 F.3d at 1533 (court told venire panel members that they were being identified by number rather than by name so the media would not contact them).

Both defendants also argue that the district court made a prejudicial statement concerning the need to conceal the identity of the members of the venire panel. The record reveals, however, that the statement complained of was made outside the presence of the jury, and thus it could not have prejudiced the jurors.

## C. Evidentiary Rulings

### 1. Visitation Conversation Recordings

Citing the Fourth Amendment and Title III of the Omnibus Crime Control and Safe Streets Act of 1968 (18 U.S.C. §§ 2510 et seq. (1994)) ("federal wiretap law"), the defendants moved to suppress the recordings of their in-person visits at the CCA facility. Both defendants contend that these conversations were protected by the federal wiretap law as wire communications, oral communications, or both. They argue that because they had a reasonable expectation of privacy during the visits, the recordings constituted an unconstitutional search. Additionally, Peoples argues that the recordings were inadmissible against him because, as a visitor to the CCA facility, he had a reasonable expectation of privacy even if Lightfoot did not because of his inmate status. Following a hearing, the magistrate judge issued a detailed report recommending denial of the motions. The district court adopted the magistrate's report and recommendation and denied the motions.

On appeal of the denial of a motion to suppress evidence, we review the court's factual findings for clear error and the court's application of the law to those facts de

novo.  <u>United States v. Tavares</u>, 223 F.3d 911, 914 (8th Cir. 2000).  We will affirm a district court's denial of such a motion "'unless it is unsupported by substantial evidence, based on an erroneous interpretation of the law, or, based on the entire record, it is clear that a mistake was made.'"  <u>Id</u>. (quoting <u>United States v. Murphy</u>, 69 F.3d 237, 240 (8th Cir. 1995)).  The federal wiretap law protects only those statements that meet the statutory definition of wire or oral communications.  18 U.S.C. §§ 2511(1)(c), 2515 (1994).

The defendants' argument that the CCA conversations were protected as wire communications is incorrect.  In order to be a protected wire communication, a conversation must be transmitted via facilities "furnished or operated by any person engaged in providing or operating such facilities for the transmission of interstate or foreign communications or communications affecting interstate or foreign commerce." 18 U.S.C. § 2510(1) (1994).  During "no-contact" visits at the CCA facility, inmates and visitors sit in different rooms, separated from each other by clear glass.  Each visiting station is separated from the adjacent ones by cement block partitions.  Visitors communicate with prisoners through an internal communication device that physically resembles a telephone handset.  The device, however, is an entirely internal system connecting only the two visiting rooms.  It is not connected to any facility capable of transmitting interstate or foreign communications.  Accordingly, the visitation conversations were not wire communications protected by the federal wiretap law.

The conversations were also not protected oral communications because the defendants had no reasonable expectation of privacy.  The federal wiretap law defines an "oral communication" as "any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation."  18 U.S.C. § 2510(2).  Before the interception of a conversation can be found to constitute a search under the Fourth Amendment or an "oral communication" under the federal wiretap law, therefore, the individuals involved must show that they had a reasonable expectation of privacy in

that conversation.  Smith v. Maryland, 442 U.S. 735, 740 (1979) ("application of the Fourth Amendment depends on whether the person invoking its protection can claim a 'justifiable,' a 'reasonable,' or a 'legitimate expectation of privacy' that has been invaded by government action"); Katz v. United States, 389 U.S. 347, 353 (1967) (government's surreptitious listening to and recording of telephone conversation "violated the privacy on which [petitioner] justifiably relied"); Angel v. Williams, 12 F.3d 786, 789-90 (8th Cir. 1993) ("oral communication" is a term of art under the federal wiretap law, referring only to communications uttered by a person reasonably expecting them to be private).

Although the defendants claim to have believed that their conversations were private and could not be overheard, any expectation of privacy was objectively unreasonable under the circumstances.  Prison inmates necessarily have reduced privacy rights because of the nature of incarceration and the myriad of institutional needs and objectives of prison facilities.  Hudson v. Palmer, 468 U.S. 517, 524 (1984); Wolff v. McDonnell, 418 U.S. 539, 555 (1974).  We agree with the district court's conclusion that CCA had legitimate security reasons for monitoring the conversations and that the recordings were not made in an attempt to gather evidence about the robberies or the murder.  Because CCA's practice of monitoring and recording prisoner-visitor conversations was a reasonable means of achieving the legitimate institutional goal of maintaining prison security and because those conversing in a prison setting are deemed to be aware of the necessity for and the existence of such security measures, we agree with the district court that the defendants' rights were not violated by the introduction of the recordings.

Nor did the fact that Peoples was a visitor and not a prisoner give him an independent reasonable basis for an expectation of privacy in his conversations with Lightfoot.  Although a visitor has a right to be free from unreasonable searches and seizures in a prison, CCA's monitoring of these conversations was not unreasonable, nor was it physically invasive of Peoples's person.  Cf. Hunter v. Auger, 672 F.2d 668,

674-75 (8th Cir. 1982) (visitors to a correctional facility may be strip searched to ensure institutional security if the administration has reasonable suspicion that the particular visitor might compromise security). The practice of monitoring conversations reflects CCA's efforts to ensure a high level of security in its facility, and there is no reason to believe that a visitor who converses with an incarcerated person has any more reasonable basis for his expectation that the conversation will remain private than has the inmate.

The defendants assert that certain factual findings relied upon by the district court in denying their motions to suppress were clearly erroneous. After a thorough review of the record, we find no clear error in the district court's findings of fact. Similarly, the defendants' contention that the recordings violated state eavesdropping statutes are of no moment because state law is inapplicable to this federal proceeding and cannot serve as a basis for suppression. See United States v. Hornbeck, 118 F.3d 615, 617-18 (8th Cir. 1997). We therefore find no error in the district court's denial of the motions to suppress the recordings.

## 2. Evidence of Other Acts

During trial, the government offered evidence relating to four robberies in Omaha, Nebraska, one robbery in St. Joseph, Missouri, and a burglary at Ross's home to establish the defendants' motives and intentions to kill Ross and to explain the context in which the murder was planned and carried out. Both defendants challenge the admission of this evidence, arguing that it was offered solely to show their criminal propensities and was thus unfairly prejudicial. Peoples further argues that because there was insufficient evidence to link him with certain of these other crimes, the evidence was unfairly prejudicial toward him.

Evidence of "other crimes, wrongs, or acts" is admissible under Rule 404(b) to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence

of mistake or accident." Fed. R. Evid. 404(b); see United States v. Davidson, 195 F.3d 402, 408 (8th Cir. 1999). We review a ruling admitting such evidence for abuse of discretion. Davidson, 195 F.3d at 408. We will reverse only if it is clear that the evidence admitted had no bearing on any material issue and was offered solely to prove the defendant's criminal propensity. United States v. Davis, 154 F.3d 772, 779 (8th Cir. 1998). The district court may admit evidence conditionally, striking it only if the court determines, based upon all of the evidence presented at trial, that no jury could reasonably find "that the act occurred and that the defendant was the actor." Huddleston v. United States, 485 U.S. 681, 689 (1988).

The district court did not err in determining that the evidence of the Omaha burglaries was relevant proof of the defendants' motives to have Ross killed. The Ross-home burglary and the St. Joseph robbery were directly related to the murder itself and thus were not "other" acts at all. Even if not considered part of the murder itself, those acts constituted evidence of the defendants' intentions and preparations to carry out the murder plan. Likewise, the district court did not abuse its discretion in determining that the probative value of the 404(b) evidence outweighed its potential prejudicial effect. Evidence regarding certain of the Omaha robberies was offered solely against Lightfoot, and the jury was instructed not to consider this evidence in determining Peoples's guilt. Our review of the record satisfies us that the government presented sufficient evidence of Peoples's involvement in certain of the other acts to warrant the admission of evidence regarding those acts.

### 3. "Snitch" Witnesses

The defendants challenge the admission of the testimony of two cooperating witnesses, Quincy Burrell and Terence Hampton, as irrelevant, unreliable, and substantially more prejudicial than probative. They further contend that the government failed to give proper Rule 404(b) notice of this testimony. The district court admitted

the testimony as relevant to the defendants' motive and to provide the context and details of the plan to kill Ross.

A district court's admission of evidence is reviewed under an abuse of discretion standard. United States v. Davis, 154 F.3d 772, 778 (8th Cir. 1998). We give deference to the district court's decision concerning the prejudicial effect and the probative value of evidence. Id. at 780. Questions of the reliability and consistency of witness testimony are within the province of the jury. United States v. Aguayo-Delgado, 220 F.3d 926, 935 (8th Cir. 2000).

Burrell had first-hand knowledge of the St. Joseph robbery and testified about admissions Peoples made to him regarding the Omaha robberies, although he was unsure of the exact dates of the Omaha robberies. Our review of the record satisfies us that the government introduced sufficient evidence that Burrell's testimony related to the robberies for which Rule 404(b) notice was given to the defendants. Because his testimony was relevant and reliable and because its probative value substantially outweighed any danger of unfair prejudice, it was properly admitted.

Hampton testified that Lightfoot had offered to sell him items taken in the Omaha robberies and that he had previously purchased stolen jewelry from Lightfoot. Lightfoot argues that this testimony was an improper bolstering of the witness's testimony and was unfairly prejudicial and irrelevant to the conduct charged. The testimony, however, was necessary to explain the nature of Hampton's relationship with Lightfoot and the source of Hampton's knowledge about the robbery. Accordingly, we conclude that the district court did not abuse its discretion in determining that Hampton's testimony was probative and was not substantially outweighed by the danger of unfair prejudice.

-10-

## 4. Police Officer's Lay Opinion Testimony

The defendants also challenge the admission of the lay opinion testimony of Lieutenant Timothy Cavanaugh of the Omaha Police Department. A district court's decision to admit or exclude lay opinion testimony is reviewed for abuse of discretion. Wactor v. Spartan Transp. Corp., 27 F.3d 347, 350 (8th Cir. 1994). Although the trial court has broad discretion to admit lay opinions, that discretion may be exercised only after the court finds "that the witness'[s] testimony is based upon his or her personal observation and recollection of concrete facts . . . , and that those facts cannot be described in sufficient detail to adequately convey to the jury the substance of the testimony." Wactor, 27 F.3d at 350 (internal quotations omitted). Lieutenant Cavanaugh testified about his first-hand observations of one of the robberies. He also gave his opinion, formed in the course of his investigation of one of the robberies, regarding the relationship among the four robberies. Accordingly, we conclude that the district court did not abuse its discretion in admitting Lieutenant Cavanaugh's opinions that were drawn from his personal observations regarding the robberies. The court also properly admitted Lieutenant Cavanaugh's lay opinion regarding the similarities and possible relationship among the robberies.[1]

## 5. Special Agent Neal's Testimony

Special Agent Joan Neal, the FBI case agent in charge of the investigation of Ross's murder, testified in connection with the recorded telephone and visitation conversations between Peoples and Lightfoot. Drawing on her investigation, Agent

---

[1]We offer no opinion whether Cavanaugh's opinions, to the extent that they were based on specialized knowledge resulting from his experience as a police officer, would be admissible under the revised version of Rule 701 that became effective on December 1, 2000. (Under revised Rule 701(c), lay opinion testimony may not be based on specialized knowledge within the scope of Rule 702.)

Neal gave her opinion regarding the meaning of words and phrases used by the defendants during those conversations. Her testimony was not limited to coded, oblique language, but included plain English words and phrases. She did not personally observe the events and activities discussed in the recordings, nor did she hear or observe the conversations as they occurred. Agent Neal's testimony included her opinions about what the defendants were thinking during the conversations, phrased as contentions supporting her conclusion, repeated throughout her testimony, that the defendants were responsible for Ross's murder.

At various points during her testimony, Agent Neal asserted that Peoples went to Ross's house to murder Ross, that he had paid "the killers to do the job," that Peoples's various comments about being in need of money revolved around his debt to hit men, and that both defendants had sought confirmation of Ross's death. She asserted that during the course of her investigation she had uncovered hidden meanings for apparently neutral words; for example, she testified that when one of the defendants referred to buying a plane ticket for Ross, he in fact meant killing Ross. In short, as the recordings of the Peoples/Lightfoot conversations were played for the jury, Agent Neal was allowed to offer a narrative gloss that consisted almost entirely of her personal opinions of what the conversations meant. During several hours of testimony alternating with recorded conversation, Agent Neal made the argument that the defendants had conspired to hire someone to kill Ross, had tendered substantial sums as a partial payment, and then had become anxious when Ross's death was not publicly reported. During direct examination, the prosecutor referred to Agent Neal's statements both as Agent Neal's contentions and as the contentions of the government.

The following excerpts are examples of Agent Neal's testimony. After a recording of Lightfoot requesting a loan was played, Agent Neal stated, "I contend [Lightfoot] is needing a loan to pay the hit man to actually murder Ross." Peoples made repeated references in the taped conversations to "lost and found situations." Agent Neal stated, "When he discusses lost and found, I believe he is talking about no

one had found the body yet.  It's just a lost situation until somebody finds the body."
After the jury heard a recording of Peoples saying, "I done already gave my loot,"
Agent Neal stated, "I contend that he has already paid the killers to do the job."  In
response to conversations that related to the burglary of Ross's house, Agent Neal
testified, "I believe [Peoples] was there to actually murder Ross at the time."

Both before and during trial, the defendants objected to the admission of Agent
Neal's testimony.  The government responded by arguing that Agent Neal's contentions
constituted lay opinions admissible under Rule 701 of the Federal Rules of Evidence.[2]
Stating that it was "possible though not certain" that Agent Neal's testimony was
admissible under Rule 701, the district court ruled that her contentions were being
admitted as "snippets of early argument from the witness stand" and not as evidence.
United States v. Peoples, No. 98-00149-01/02-CR-W-6, 2000 WL 97180 at *1 (W.D.
Mo. Jan. 25, 2000) (internal quotation marks omitted).

Federal Rule of Evidence 602 requires that a witness have personal knowledge
of the matters about which she testifies, except in the case of expert opinions.  Rule 701
adds that testimony in the form of lay opinions must be rationally based on the
perception of the witness.  When a law enforcement officer is not qualified as an expert
by the court, her testimony is admissible as lay opinion only when the law enforcement
officer is a participant in the conversation, has personal knowledge of the facts being
related in the conversation, or observed the conversations as they occurred.  See, e.g.,
United States v. Parsee, 178 F.3d 374, 379 (5th Cir. 1999) (witness was a participant
in the conversation); United States v. Saulter, 60 F.3d 270, 276 (7th Cir. 1995) (witness

---

[2]The government now argues that Agent Neal's testimony was admissible under
Rule 702.  At trial, however, the government conceded that Agent Neal was not
offering expert testimony, and the district court made clear that it did not consider
Agent Neal's contentions as constituting such testimony.  Thus, we reject the
government's belated argument that Rule 702 provides a basis for admitting Agent
Neal's contentions.

had first hand knowledge of the facts being related); <u>United States v. Awan</u>, 966 F.2d 1415, 1430 (11th Cir. 1992) (undercover agent was a participant in the conversations and had personal knowledge of the facts being discussed). Lay opinion testimony is admissible only to help the jury or the court to understand the facts about which the witness is testifying and not to provide specialized explanations or interpretations that an untrained layman could not make if perceiving the same acts or events.[3] <u>See United States v. Cortez</u>, 935 F.2d 135, 139-40 (8th Cir. 1991); <u>United States v. Figueroa-Lopez</u>, 125 F.3d 1241, 1244-45 (9th Cir. 1997).

Law enforcement officers are often qualified as experts to interpret intercepted conversations using slang, street language, and the jargon of the illegal drug trade. <u>See, e.g.</u>, <u>United States v. Delpit</u>, 94 F.3d 1134, 1144 (8th Cir. 1996) (police officer gave expert testimony interpreting slang and drug codes in connection with recorded telephone calls); <u>United States v. Plunk</u>, 153 F.3d 1011, 1017 (9th Cir. 1998) (police officer gave expert testimony based on his specialized knowledge of narcotics code terminology); <u>United States v. Earls</u>, 42 F.3d 1321, 1324-25 (10th Cir. 1994) (expert testimony was proper to show that defendants were speaking in code). What is essentially expert testimony, however, may not be admitted under the guise of lay opinions. <u>See, e.g.</u>, <u>United States v. Figueroa-Lopez</u>, 125 F.3d at 1244-46; <u>Harvey v. Wal-Mart Stores, Inc.</u>, 33 F.3d 969, 971 (8th Cir. 1994); <u>Wactor</u>, 27 F.3d at 351; <u>Kostelecky v. NL Acme Tool/NL Indus., Inc.</u>, 837 F.2d 828, 830 (8th Cir. 1988); <u>Krueger v. State Farm Mut. Auto. Ins. Co.</u>, 707 F.2d 312, 316-17 (8th Cir. 1983). Such a substitution subverts the disclosure and discovery requirements of Federal Rules of Criminal Procedure 26 and 16 and the reliability requirements for expert testimony as set forth in <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993) and <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137 (1999).

---

[3]Although not in effect at the time of trial, the 2000 revisions to Rules 701 and 702 emphasize this distinction between lay and expert opinion testimony. <u>See</u> Fed. R. Evid. 701 advisory committee's note to 2000 Amendments.

Agent Neal lacked first-hand knowledge of the matters about which she testified. Her opinions were based on her investigation after the fact, not on her perception of the facts. Accordingly, the district court erred in admitting Agent Neal's opinions about the recorded conversations. The court's instructions to the jury that Agent Neal's opinions constituted argument rather than evidence finds no warrant in the Federal Rules of Evidence and could not serve to render admissible that which was inadmissible testimony.

There remains the question whether the admission of Agent Neal's testimony constituted harmless error. We conclude that it did not. The erroneous admission of testimony is not harmless when there is a significant possibility that the testimony had a substantial impact on the jury. See Delpit, 94 F.3d at 1145.

In Delpit, we held that the admission of expert testimony interpreting wire-tapped telephone conversations was harmless despite the fact that the police expert's testimony "appear[ed] on occasion to have gone beyond" its permissible scope because the expert's "occasional elaborations" were supported by other evidence. Id. Unlike Agent Neal, however, the police witness in the Delpit case was qualified as an expert in interpreting street slang and code words. Id. Moreover, the Delpit error resulted only in occasional impermissible interjections within a body of properly admissible testimony, id., whereas the error in this case infected the totality of Agent Neal's testimony. Nor can we describe Agent Neal's testimony as "grounded in other evidence," id., because it consisted largely of her assertions about the meaning of apparently clear statements, together with her addition of details and explanations absent from the recordings. Under the guise of offering lay opinion, Agent Neal was allowed to emboss apparently neutral conversations between the defendants with the imprimatur of the government's case. Rather than offering evidence of which she had personal knowledge, such as the details of her investigation, she was allowed repeatedly to assert that the defendants were discussing not everyday events, but a complicated murder plot.

We note that Larry Platt, a participant in some of the robberies, testified extensively against the defendants. His testimony, however, was not so damaging to them as to render Agent Neal's testimony harmless. Platt had no first-hand knowledge of Ross's murder, and he testified only to a series of conversations about "issuing a plane ticket" to Ross, conversations that he admits he never told anyone about until after he was charged in the robberies. Agent Neal's testimony contained conversations and details that were absent from Platt's testimony, particularly regarding the defendants' efforts to get money to pay hit men and to discover whether Ross's murder had been accomplished. The defendants also subjected Platt to rigorous cross-examination as an interested witness whose story had changed dramatically, and the jury may well have found his testimony inadequate to support a guilty verdict beyond a reasonable doubt had it not been buttressed by Agent Neal's supporting information and opinions.

Moreover, the jury may well have been inclined to give Agent Neal's conclusions undue weight because of her status as an FBI agent. Despite the fact that the court did not qualify her as an expert, Agent Neal was identified as a law enforcement officer, and we cannot rule out the possibility that the jurors may have been inclined to substitute her conclusions on the ultimate issue of the defendants' guilt for their own. In a word, Agent Neal's testimony so invaded the province of the jury that we cannot with confidence say that there was no significant possibility that it had substantial impact on the jury. Accordingly, we must set aside the convictions.

The judgments of conviction are reversed, and the case is remanded to the district court for new trial.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.