# United States Court of Appeals
## For the Eighth Circuit

_____

No. 15-3194

_____

United States of America

*Plaintiff - Appellee*

v.

Adrian Romal Lomas

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Southern District of Iowa - Davenport

_____

Submitted: April 14, 2016
Filed: June 27, 2016

_____

Before RILEY, Chief Judge, WOLLMAN and MURPHY, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

A jury found Adrian Romal Lomas guilty of bank robbery, in violation of 18 U.S.C. § 2113(a), and was sentenced by the district court[1] to 240 months' imprisonment. On appeal, Lomas challenges several of the district court's evidentiary

_____

[1]The Honorable James E. Gritzner, United States District Judge for the Southern District of Iowa.

rulings, the court's denial of his motion for a mistrial, and the court's sentence. We affirm.

On June 6, 2014, Lomas and G.Y., a fifteen-year-old juvenile, robbed a branch of the Family Credit Union in Davenport, Iowa. Lomas, wearing sunglasses, a Chicago Bulls baseball cap, a bandana, and gloves, approached the teller on duty, displayed a pistol tucked into the front waistband of his pants, and demanded "all the money" in the teller drawer. G.Y., wearing a hooded sweatshirt, a bandana, and gloves, stood behind Lomas at the teller counter and passed Lomas a backpack into which Lomas placed the $4,075 that the teller handed over from her drawer. Several surveillance cameras inside the credit union recorded the robbery.

Lomas and G.Y. ran out of the credit union and down the street, where they jumped into a light blue Ford Windstar minivan that was waiting for them with its sliding door open. Natasha Havercamp, who happened to be driving past the area at the time, observed Lomas and G.Y., both with bandanas still obscuring their faces, as they ran to the minivan and leapt inside. Havercamp followed the minivan a short distance, noted the vehicle's license plate number, and called the Davenport police department to report the suspicious activity. At about the same time, the Davenport police received a call that the credit union had been robbed. Believing the two incidents were likely related, the police ran the license plate number provided by Havercamp and learned that the minivan was registered to Danielle Levetzow at an address on LeClaire Street in Davenport. Officers proceeded to LeClaire Street, but the minivan was not there. An officer watching the residence from a nearby alley was approached by one of Levetzow's neighbors, who agreed to notify police when the minivan returned.

Levetzow, Lomas, and Levetzow's two young children returned to LeClaire Street in the minivan later that afternoon; Levetzow's neighbor called the police; and officers quickly arrived to secure the area and maintain surveillance of the residence

while a search warrant was obtained. Levetzow and the children soon left the house, and police arrested Levetzow and detained the children until Levetzow's mother, Cheryl Levetzow (Cheryl), arrived. Although officers continued to watch the residence, when they eventually executed the search warrant, Lomas was not inside the house. One of the officers had earlier seen an individual walking away from the general area, but the officer did not recognize that individual as Lomas. Only after execution of the search warrant revealed an empty house did officers realize that it was Lomas who had walked away. The police seized several items from the residence and impounded Levetzow's minivan.

In the meantime, Levetzow was taken to the police station and charged with robbery. At the station, Detectives Tim Murphy and Bill Thomas, as well as Sergeant Kevin Smull, interviewed Levetzow about the robbery. Murphy and Smull testified that Levetzow initially denied any knowledge of the robbery and claimed that the $700 in cash she had been carrying was money for rent. After the officers repeatedly accused her of lying, however, she admitted that she was the getaway driver for the credit union robbery. Levetzow revealed details about the robbery, including a description of the clothing worn by the two robbers, whom she identified as Lomas and a man she had just met named "Emanuel." She told the officers that the backpack used in the robbery had been thrown into the river. After the interview, Levetzow was bailed out of jail by Cheryl, who then drove Levetzow and her children back to the LeClaire Street residence. Cheryl testified that she had obtained the bail money from a grocery bag containing $2,500 in cash from the robbery that Levetzow had stashed in a bathroom cabinet at Cheryl's house earlier that day. When the group arrived at the LeClaire Street residence, they found Lomas asleep on the couch.

Although the police had obtained a warrant to arrest Lomas for the robbery, they were unable to locate him, and so on June 11 they obtained a warrant to track the location of Lomas's cellular telephone, and, after receiving data from his service provider, they learned that Lomas's cell phone was "pinging" near the airport in

-3-

Moline, Illinois. Officers were also aware that Levetzow had retrieved her minivan from the police impound lot, so they began searching for it in the area near the airport. The police eventually discovered the minivan in a motel parking lot and learned which room Levetzow had rented. While officers were preparing to approach, Lomas exited the motel room and was arrested. Inside the room, officers found Levetzow; G.Y.; and Levetzow's three children, including her teenage daughter, A.S. The police arrested G.Y., detained Levetzow, and obtained Levetzow's consent to search the motel room, where they seized cell phones belonging to Lomas, G.Y., and A.S. Officers obtained a warrant to search Lomas's cell phone and learned that text messages seeking to borrow a "tool" or a "unit" had been sent from the phone to several telephone numbers in the days prior to the robbery.

Two days after Lomas and G.Y. were arrested at the motel, Detective Scott Lansing and another officer interviewed Levetzow again, at which time she admitted that the backpack from the robbery had been hidden and not thrown into the river. She then led the two officers to an alley and pointed to a large bush, from which Lansing recovered and then opened the backpack, which contained the robbers' clothing, along with an imitation firearm—a BB gun that had been altered to appear real.

G.Y., who had already pleaded guilty to the credit union robbery and was incarcerated at the Iowa State Reformatory, testified that he and Lomas committed the robbery and that Levetzow drove the getaway vehicle. He further stated that he had obtained the BB gun that Lomas had carried in the front waistband of his pants and displayed to the teller during the robbery. He also identified the backpack and its contents as items he and Lomas had used in the robbery.

Levetzow's daughter A.S. testified that she overheard Lomas and Levetzow discussing a plan to rob a bank. She also overheard Lomas describe the plan to G.Y.

-4-

and request G.Y.'s help locating a firearm, which Lomas referred to as a "tool." A.S. also testified that Lomas, Levetzow, and G.Y. had discussed the robbery in her presence in the motel room, including a discussion of "where the money was."

The district court rejected Lomas's pretrial objection to the government's introduction of evidence that on April 30, 2014, some five weeks before the credit union robbery, Lomas had discarded a firearm behind the wheel of a parked vehicle and that police had recovered the firearm after they arrested Lomas. The court agreed with the government that this evidence was "relevant and probative" to "explain[] why [Lomas] was looking for a gun in the days . . . leading up to the robbery." Sally Cerra, whose kitchen window faced the alley, testified that she had seen two men running in an alley behind her residence on April 30 and that one of the men, later identified as Lomas, had removed a firearm from the front waistband of his pants and had placed it on the ground behind the wheel of a parked vehicle. Sergeant Smull testified that he was responding to a call of "shots fired" near a high school on April 30 when he noticed Lomas and another man standing in an alley and detained them both. Smull stated that Cerra informed him about what she had seen and that he then found a .45-caliber firearm beneath the vehicle. Smull also testified that he had observed Levetzow driving the light blue minivan in the area while these events unfolded. Lomas moved for a mistrial, which the district court denied.

Following the entry of the verdict, a Presentence Investigation Report (PSR) was prepared. It recommended a base offense level of 20 for the robbery, U.S. Sentencing Guidelines Manual (U.S.S.G. or Guidelines) § 2B3.1; a 2-level enhancement for taking property from a financial institution, § 2B3.1(b)(1); a 3-level enhancement for brandishing a dangerous weapon, § 2B3.1(b)(2)(E); a 2-level enhancement for acting as an organizer or leader, § 3B1.1(c); and a 2-level enhancement for using a minor in the offense, § 3B1.4, resulting in an adjusted offense level of 29. Because of Lomas's two prior felony convictions—a 1996 Iowa conviction for first-degree robbery and a 2010 Nebraska conviction for burglary—the

PSR recommended that the § 4B1.1 career-offender provision be applied, leading to a total offense level of 32, which, when coupled with a criminal history category of VI, resulted in an advisory Guidelines sentencing range of 210 to 240 months in prison.

In a sentencing memorandum, the government initially took the position that Lomas's 2010 Nebraska burglary conviction was not a crime of violence under the Guidelines career-offender provision because Lomas had burglarized a business, not a dwelling. See U.S.S.G. § 4B1.2(a)(2) (defining "crime of violence" to mean "burglary of a dwelling"). Without the application of the career-offender provision, Lomas's total offense level would have been 29 and his sentencing range 151 to 188 months. But because of Lomas's extensive and violent criminal history, the government moved for an upward variance from this range to a sentence of 240 months. Prior to the sentencing hearing, however, the government changed its position and argued in a supplemental sentencing memorandum that Lomas was properly characterized as a career offender.

Lomas filed objections to the PSR, challenging the facts on which the aggravating-role, brandishing, and using-a-minor enhancements were based. He also argued that his 2010 burglary conviction under Nebraska Revised Statutes § 28-507(1) did not qualify as a predicate crime of violence for purposes of the career-offender provision. To establish that the conviction qualified as a predicate crime of violence, the government introduced the Nebraska judgment and charging document, which set forth the statutory language, as well as a "Google Maps photo" of the building located at the address set forth in the charging document. Lomas objected to the introduction of this evidence, arguing that because the Nebraska burglary statute was "broader than generic burglary" and was "indivisible," the court documents underlying the Nebraska conviction were not admissible and the Nebraska burglary conviction was categorically not a crime of violence under Descamps v. United States, 133 S. Ct. 2276 (2013). The district court rejected Lomas's argument,

concluding that the Nebraska burglary conviction qualified as a crime of violence and that the career-offender provision applied.

Lomas thereafter requested a sentence of 151 months, arguing that "[t]he Guidelines, without the career offender designation, would be 151 to 188" months and that a 151-month sentence would "more than adequately address" the sentencing factors raised by the government "in [its] first Sentencing Memo." The district court disagreed, concluding instead that a 240-month sentence was appropriate, regardless of whether the career offender provision applied. Specifically, the court stated:

> I would reach the same sentence either under the Career Offender Guideline, which places the 240 months at the top of the Guideline range, or as a result of an upward variance even if we were considering the range of 151 to 188. . . . As indicated, the Court does reach this sentence either on the basis of the career offender status or on the basis of dangerousness and likelihood of crimes in the future.

Lomas first argues that the district court erred in admitting the "irrelevant and highly prejudicial" testimony of Cerra and Smull that he had discarded a firearm several weeks before the credit union robbery. We review a district court's decision to admit evidence of a prior bad act for abuse of discretion, reversing "only when such evidence clearly had no bearing on the case and was introduced solely to prove the defendant's propensity to commit criminal acts." United States v. Yielding, 657 F.3d 688, 701 (8th Cir. 2011) (internal quotation marks and citation omitted). While evidence of a prior bad act is not admissible to show propensity, it is admissible to show "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b). Such evidence is admissible if (1) it is relevant to a material issue, (2) it is similar in kind and not overly remote in time to the charged offense, (3) it is supported by sufficient evidence, and (4) its potential prejudice does not substantially outweigh its probative value. See Yielding, 657 F.3d at 701.

We conclude that the challenged testimony was relevant to the crime charged. It demonstrated that Lomas had knowledge of firearms, that he had carried a similar-looking firearm within weeks of the robbery, and that he had carried the firearm in a fashion similar to that employed by the bank robber—in the front waistband of his pants. In addition, this testimony showed that shortly before the bank robbery, Lomas was associated with Levetzow, an accomplice in the robbery, and her minivan, the getaway vehicle used in the bank robbery. Moreover, Lomas's abandonment of the firearm in April 2014 and its subsequent seizure by the police was relevant to show why Lomas was searching for a firearm in the days preceding the June 2014 bank robbery. Thus, it cannot be said that this testimony "clearly had no bearing on the case and was introduced solely to prove [Lomas's] propensity to commit criminal acts." See Yielding, 657 F.3d at 701; see also Fed. R. Evid. 401 (noting that evidence is relevant if it has "any tendency" to make a fact that is of consequence in determining the action more or less probable than it would be without the evidence).

We also conclude that the potentially prejudicial effect of the challenged testimony did not substantially outweigh its probative value. Only "evidence that is unfairly prejudicial, that is, [evidence that] tends to suggest decision on an improper basis" will be excluded as substantially more prejudicial than probative. United States v. Myers, 503 F.3d 676, 682 (8th Cir. 2007). "[E]vidence that is merely prejudicial in the sense of being detrimental to a [defendant's] case," on the other hand, is admissible. Id. (citation omitted). There is little question that the testimony at issue here was prejudicial, but it was not unfairly so. Neither Smull nor Cerra testified that Lomas fired, brandished, or used the firearm in any manner that was illegal. Although Lomas's efforts to conceal the firearm under the parked vehicle might have suggested some wrongdoing on his part, the district court admonished the jury that the testimony should not be considered as evidence that Lomas's possession of the firearm was illegal or that he was connected in any way to the "shots fired" investigation mentioned by Smull. This limiting instruction substantially diminished any danger that the jury would decide the case on an improper basis. See United

-8-

States v. Kent, 531 F.3d 642, 651 (8th Cir. 2008) (noting that "this Court has been reluctant to find that the evidence was unfairly prejudicial when the district court gave an appropriate limiting instruction") (citation omitted); United States v. Paul, 217 F.3d 989, 997 (8th Cir. 2000) (noting that "a jury is presumed to follow all instructions"). Accordingly, we conclude that the district court did not abuse its discretion by admitting the testimony that Lomas discarded a firearm in April 2014.

Lomas also contends that the district court abused its discretion by denying his motion for a mistrial after Smull testified that he had been in the area where Lomas discarded the firearm in response to a call of "shots fired" at a nearby high school. See United States v. Nelson, 984 F.2d 894, 897 (8th Cir. 1993) (standard of review). Lomas argues that the "shots fired" testimony improperly suggested to the jury that he was the shooter involved in the incident, which created a risk of undue prejudice that warranted a mistrial. We disagree. After hearing argument from counsel outside the presence of the jury, the district court denied Lomas's motion for a mistrial and suggested submitting a limiting instruction to the jury. Defense counsel questioned the adequacy of any limiting instruction, but eventually consented to the court's proposed instruction in light of the court's denial of a mistrial. The court then directed the jury "to completely disregard any reference to shots fired at a school in your consideration of this case and your deliberations." The court also cautioned the jury that Lomas was "not here charged with possession of a firearm" and that Smull's testimony was not evidence that Lomas "was unable to be in possession of a firearm."

The "admission of allegedly prejudicial testimony is ordinarily cured by an instruction to the jury to disregard the testimony," Nelson, 984 F.2d at 897, because the jury is presumed to follow such an instruction, see Paul, 217 F.3d at 997. The district court properly instructed the jury to disregard Smull's "shots fired" testimony and to consider the remainder of his testimony only for the limited purpose of determining whether Lomas possessed a firearm in April 2014. Accordingly, we conclude that the court did not abuse its discretion in denying Lomas's motion for a

mistrial.  See Kent, 531 F.3d at 651 (noting our reluctance to find such testimony "unfairly prejudicial when the district court gave an appropriate limiting instruction").

Lomas next argues that the district court erred in admitting the alleged hearsay testimony of several witnesses describing statements made by Levetzow, who did not testify at trial.  We review a district court's evidentiary rulings for abuse of discretion. United States v. Burch, 809 F.3d 1041, 1045 (8th Cir. 2016).  A district court's error in admitting hearsay evidence is harmless if the "error did not influence or had only a very slight influence on the verdict."  Id. (quoting United States v. Eagle, 498 F.3d 885, 888 (8th Cir. 2007)).

Lomas first challenges the testimony of Detective Kevin Murphy, who stated during redirect examination that when he interviewed Levetzow on the day of the robbery, she admitted that "she knew it was a robbery" and that Lomas "was the robber." This testimony came in response to defense counsel's first broaching during cross examination the subject of Murphy's interview with Levetzow on the day of the robbery. Defense counsel elicited Murphy's testimony that Levetzow initially denied knowing why she was being interviewed by the police that day, that the officers conducting the interview several times accused Levetzow of lying, that she told the officers that the backpack used in the robbery had been thrown into the river, and that she wanted Lomas "buried."

"It is fundamental that where the defendant 'opened the door' and 'invited error' there can be no reversible error." United States v. Beason, 220 F.3d 964, 968 (8th Cir. 2000) (quoting United States v. Steele, 610 F.2d 504, 505 (8th Cir. 1979)). Murphy's redirect testimony was admissible to clarify or rebut the issues first raised by defense counsel on cross-examination, see id., and thus we conclude that the district court did not abuse its discretion by admitting it, see United States v. Noe, 411 F.3d 878, 886 (8th Cir. 2005) (concluding that district court did not abuse its

discretion by allowing government to clarify on redirect false impression created by defendant on cross-examination).

Lomas next challenges the testimony of Levetzow's teenage daughter, A.S., who stated that she was present while Levetzow and Lomas discussed robbing a bank and that she was present in the motel room after the robbery while Levetzow, Lomas, and G.Y. discussed "where the money was and stuff." The statements made by Lomas himself and overheard by A.S. are nonhearsay statements or admissions "made by the party" and were properly admitted. See Fed. R. Evid. 801(d)(2)(A); see also United States v. Cline, 570 F.2d 731, 736 (8th Cir. 1978) (citing Rule 801(d)(2)(A) and concluding that "[t]he testimony was not hearsay because it was appellant's own statement which was being offered against him"); United States v. Faulkner, 636 F.3d 1009, 1019 (8th Cir. 2011) (same). A.S.'s testimony was also admissible as evidence of Lomas's nonhearsay adoptive admissions. See Fed. R. Evid. 801(d)(2)(B) (noting that a statement is not hearsay if it "is offered against an opposing party and . . . is one the party manifested that it adopted or believed to be true") "For an out-of-court statement to constitute an adoptive admission, the defendant must have been present when the statement was made, have understood it, and have had an opportunity to deny it." United States v. Kehoe, 310 F.3d 579, 591 (8th Cir. 2002). These requirements are satisfied: Lomas was present and engaged in conversation with Levetzow (or with Levetzow and G.Y.) when the statements were made and overheard by A.S., and Lomas does not argue that he failed to understand the content or import of the statements or that he did not have an opportunity to deny the truth of the statements. The district court thus did not abuse its discretion by admitting the challenged testimony. See id. (concluding that a bystander's statement was the defendant's own, because he did not contradict or deny it).

Lomas makes two additional hearsay arguments. He challenges the testimony of Detective Scott Lansing, who stated that he spoke with Levetzow on June 13, sometime after Lomas had been arrested at the motel, and that Levetzow had

remarked that "she knew where the backpack was that contained the outfits which [Lomas and G.Y.] were wearing that day for the robbery." Lomas also challenges the introduction of screenshots of Facebook private messages exchanged between A.S., G.Y., and another individual shortly after the robbery, in which A.S. states, among other incriminating remarks, "[l]ook up the davenport bank robbery it was [G.Y.] and [Lomas] and my mom drove them." We need not determine whether the challenged evidence constituted inadmissible hearsay, because any error in admitting it was harmless.

"An erroneous evidentiary ruling is harmless if it does not have a substantial influence on the outcome" of the trial. Yielding, 657 F.3d at 700. The government presented overwhelming evidence that Lomas committed the bank robbery, including the testimony of G.Y., who committed the robbery with Lomas; the testimony of the teller Lomas confronted during the robbery; the recordings from the credit union security cameras; the testimony of A.S., who overheard Lomas planning the robbery and discussing the proceeds therefrom; and the text messages from Lomas's cell phone in which he was searching for a "tool" or a "unit" shortly before committing the robbery. In light of this evidence, we conclude that the district court's admission of Lansing's testimony and A.S.'s Facebook conversations "did not have a substantial influence on the verdict and was harmless beyond a reasonable doubt." Id. at 701; see also United States v. Londondio, 420 F.3d 777, 789 (8th Cir. 2005) (noting that admission of hearsay evidence that is cumulative of properly admitted evidence "is not likely to influence the jury and is therefore harmless error").[2]

---

[2]Lomas also challenges the testimony of Levetzow's mother, Cheryl, arguing that the district court improperly admitted "Levetzow's statement to her mother that Lomas 'called her and told her to come get her clothes'" after officers had arrived at the LeClaire Street residence on the date of the robbery. Lomas misstates the record. Cheryl testified that it was A.S., not Levetzow, who had received the call from Lomas to retrieve clothing from the house. In her own unobjected-to testimony on this point, A.S. confirmed that this conversation with Lomas had occurred. Thus, any error in

Lomas next argues that the district court abused its discretion by permitting A.S. and Special Agent Jeffrey Huber to testify as lay witnesses that Lomas was referring to a firearm when he used the terms "tool" and "unit" in conversations and text messages. See United States v. Peoples, 250 F.3d 630, 639 (8th Cir. 2001) (standard of review).

As for the testimony of A.S., a lay witness is permitted to express an opinion that is "rationally based on his . . . perception, and helpful to . . . determining a fact in issue." United States v. Lemons, 792 F.3d 941, 948 (8th Cir. 2015) (citing Fed. R. Evid. 701). "Personal knowledge or perceptions based on experience is sufficient foundation for lay opinion testimony." United States v. Smith, 591 F.3d 974, 982 (8th Cir. 2010) (citation omitted). A.S. lived with Levetzow and Lomas in the LeClaire Street residence, and she based her testimony regarding Lomas's use of the word "tool" as a synonym for "gun" on her direct observations and perceptions of Lomas. Her testimony was helpful to determining a fact in issue, namely, whether Lomas used the word "tool" as a synonym for "firearm." A.S.'s testimony was thus relevant and admissible as lay opinion testimony. See United States v. Fregoso, 60 F.3d 1314, 1326 (8th Cir. 1995) (noting that a witness may testify about her understanding of words used in a conversation she has witnessed).

Lomas argues that Agent Huber's testimony about the meaning of "tool" and "unit" in Lomas's text messages was improper because Huber did not observe the text messages as they were occurring and did not testify regarding his personal perceptions, both of which are required for lay opinion testimony to be admissible. The government counters that Huber's statements were admissible as expert

admitting Cheryl's testimony was harmless. See United States v. Johnson, 535 F.3d 892, 898 (8th Cir. 2008) (concluding that the admission of inadmissible hearsay was harmless when the declarant testified and was available for cross-examination).

testimony of a witness whose "knowledge, skill, experience, training, or education" assisted the jury in understanding the evidence. Fed. R. Evid. 702.

Although Agent Huber likely would have qualified as an expert on criminal behavior and terminology in light of his credentials, he was not offered as such by the government. Thus, we are doubtful that Huber testified as an expert with respect to the challenged testimony. See Fed. R. Crim. P. 16(a)(1)(G). When "a law enforcement officer is not qualified as an expert . . . [his] testimony is admissible as lay opinion only when [he] is a participant in the conversation, has personal knowledge of the facts being related in the conversation, or observed the conversations as they occurred." Peoples, 250 F.3d at 641. In Peoples, an FBI agent, testifying as a lay witness, gave extensive opinion testimony, "based on her investigation after the fact," regarding the meaning of common words and phrases and "offer[ed] a narrative gloss that consisted almost entirely of her personal opinions of what the [recorded] conversations meant" and "what defendants were thinking." Id. at 640-41. We concluded that the testimony went far beyond admissible lay opinion testimony and was instead expert testimony improperly admitted "under the guise of lay opinion[]" testimony. Id. Here, by contrast, Huber's challenged testimony was relatively brief and was limited to interpreting Lomas's "coded" terminology to refer to a firearm, and thus there is not a significant possibility that it had a substantial impact on the jury's verdict. Cf. id. at 642. See United States v. Manning, 738 F.3d 937, 942 (8th Cir. 2014) (noting that we reverse an erroneous evidentiary ruling "only if [the] error affects the substantial rights of the defendant or has more than a slight influence on the [jury's] verdict"); see also United States v. Turner, 781 F.3d 374, 388-89 (concluding that improperly admitted expert testimony of coconspirator witness, who interpreted code words used by others in recorded conversations played for the jury, did not affect the verdict where other witnesses interpreted similar words). A.S. had already testified to Lomas's use of the word "tool" to refer to a firearm, so Huber's testimony was at the most partially cumulative. See id. In light of the already-noted overwhelming evidence that Lomas committed

-14-

the robbery while displaying an imitation firearm, any error in admitting Huber's challenged testimony was unlikely to have affected the jury's verdict, and thus it was harmless. See id.; cf. Londondio, 420 F.3d at 789 (holding that admission of hearsay testimony that is cumulative of properly admitted evidence "is not likely to influence the jury and is therefore harmless error").

Finally, Lomas argues that the district court erred in applying the Guidelines career-offender provision to calculate his sentence. He contends that because his 2010 Nebraska burglary conviction was not a predicate crime of violence under § 4B1.2(a), he did not have the two prior felony convictions necessary for career-offender purposes. We need not rule on this contention, however, for any error in the district court's finding that Lomas was a career offender would be harmless given the district court's alternative ruling. See United States v. Sayles, 674 F.3d 1069, 1072 (8th Cir. 2012) (noting that a procedural sentencing error does not require reversal if the district court "specifically identifies the contested issue and potentially erroneous ruling, sets forth an alternative holding supported by the law and the record in the case, and adequately explains its alternative holding").

At sentencing, the government inquired whether the district court would have imposed the same sentence had the court not found that Lomas was a career offender. The district court responded affirmatively, specifically noting that, after considering the § 3553(a) factors, it was granting the government's motion for an upward variance to a 240-month sentence "even if we were considering the [non-career-offender Guidelines] range of 151 to 188 months." The district court emphasized the seriousness of Lomas's offense, including the fact that Lomas "terrif[ied] the bank teller" and "involve[d] a kid" in the offense. The court also acknowledged its obligation to protect the public from further crimes by Lomas, specifically noting that Lomas's extensive criminal history suggested "almost an absolute certainty" that he would recidivate. The court recognized its duty to adequately deter criminal conduct of other persons and its obligation to avoid unwarranted sentence disparities,

-15-

observing that Lomas's conduct was "dissimilar from many cases of this kind." In light of the district court's unequivocal statement that it would impose a 240-month sentence notwithstanding its application of the career-offender provision, any error in applying that provision is harmless.

Lomas contends that the district court's alternative sentence is invalid because the court did not resolve his outstanding objections to the brandishing, leader-or-organizer, and use-of-a-minor enhancements that contributed to the 151- to 188-month Guidelines sentencing range. As set forth above, the factual basis for imposing these enhancements was established by the evidence presented at trial. Lomas was identified as the individual who displayed the imitation firearm used during the robbery; the surveillance recordings, as well as the testimony of the teller and G.Y., established that Lomas was the leader or organizer of the offense; and G.Y. testified that he was a minor when the offense was committed.[3] The district court noted the objections but "relie[d] upon the record made in the case," including the PSR, the "memoranda of counsel, [and] the supplemental materials," to impose the challenged enhancements. See United States v. Esqueda, 599 F. App'x 608, 609 (8th Cir. 2015) (per curiam) (rejecting defendant's argument that district court failed to make adequate findings to support application of enhancement where record supported enhancement and the court stated "that it was making its decision based on its review of the record"); United States v. Civey, 364 F. App'x 284, 286 (8th Cir. 2010) (per curiam) ("The evidence adduced at trial . . . provided a basis for the enhancement."). Moreover, Lomas invited the court to consider the advisory Guidelines range he now challenges as erroneous. At the sentencing hearing, defense counsel stated that the Guidelines range "without the career offender designation, would be 151 to 188. That would even include . . . the[] enhancements" at issue here.

---

[3]Contrary to Lomas's argument on appeal, the district court did find that Lomas used a minor in the offense, stating that Lomas "did indeed involve a kid in the process of this crime."

Defense counsel asked the court to impose a sentence at the "low end of the noncareer offender Guidelines," specifically stating that "based on all the factors . . . we are asking for a sentence of 151 months." In view of those requests, Lomas will not now be heard to argue that the district court clearly erred in determining that the facts were sufficient to support the challenged enhancements.

The judgment is affirmed.

_____