# United States Court of Appeals
## For the Eighth Circuit

_____

No. 18-3745

_____

United States of America

*Plaintiff - Appellee*

v.

Ryan Randall Gilbertson

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of Minnesota

_____

Submitted: February 14, 2020
Filed: July 30, 2020

_____

Before LOKEN, BENTON, and KELLY, Circuit Judges.

_____

BENTON, Circuit Judge.

A jury convicted Ryan Randall Gilbertson of 14 counts of aiding and abetting wire fraud, one count of conspiracy to commit securities fraud, and six counts of aiding and abetting securities fraud in violation of 18 U.S.C. § 1343, 18 U.S.C. § 371,

and 15 U.S.C. §§ 78j(b) and 78ff. The district court[1] sentenced him to 144 months' imprisonment and ordered him to pay $15,135,361 in restitution. Gilbertson appeals his conviction and the restitution. Having jurisdiction under 28 U.S.C. § 1291, this court affirms.

I.

In 2008, Gilbertson (a former derivatives trader), Michael Reger, and James Sankovitz founded Dakota Plains, an oil-transporting company. Gilbertson and Reger concealed their involvement, appointing their fathers as officers and sole members of the board of directors. However, they exercised complete control over the company. Gilbertson effectively controlled its finances.

In January 2011, Gilbertson caused Dakota Plains to issue $3.5 million in promissory notes at 12% interest (the "Senior Notes"). Gilbertson purchased a $1 million Senior Note for himself and another $100,000 Senior Note for a nonprofit corporation he controlled.

In April 2011, Gilbertson and Reger installed Gabe Claypool as CEO of Dakota Plains. According to Claypool, "All the financial decisions were driven by Ryan [Gilbertson]." Within two weeks after Claypool became CEO, Gilbertson and Reger directed him to issue an additional $5.5 million in promissory notes at 12% interest (the "Junior Notes"). Gilbertson and Reger held the majority of the Junior Notes directly or indirectly. The Junior Notes included a complex bonus payment provision[2] entitling

_____

[1]The Honorable Patrick J. Schiltz, United States District Judge for the District of Minnesota.

[2]The bonus payment provision is referenced throughout the documents and at trial by many terms, including the "additional payment provision," the "embedded derivative," and a "synthetic conversion feature." All these terms refer to the same

the noteholders to an additional payment (the "bonus payment") if the company went public through an initial public offering ("IPO"). The amount of the bonus payment was tied to the initial offering price of Dakota Plains stock at the time of the IPO; the higher the initial offering price, the higher the bonus payment. Claypool testified he had no "role in crafting" the bonus payment provision and "did not understand it at the time." Nevertheless, he approved it at Gilbertson's direction.

In October 2011, Gilbertson proposed consolidating the Senior Notes and Junior Notes into consolidated promissory notes (the "Consolidated Notes"). He also proposed amending the bonus payment provision to: (1) apply to the total value of the Consolidated Notes ($9 million), not just the amount lent under the Junior Notes ($5.5 million); (2) trigger not only by an IPO, but by any public offering, including a reverse merger; and (3) be calculated not by the IPO price, but by the average price of Dakota Plains stock during the first 20 days of public trading. Under the new provision, noteholders would be entitled to the bonus payment if Dakota Plains stock traded above an average closing price of $2.50 per share during the first 20 days of public trading. The higher the stock traded above that price, the larger the bonus payment. The Dakota Plains board, now comprised of additional members, approved the note consolidation and amendments to the bonus payment provision.

Unbeknownst to Claypool and the board, Gilbertson had already arranged to take Dakota Plains public through a reverse merger. Nine months earlier (in January 2011), Gilbertson approached Thomas Howells—a Utah-based business consultant specializing in reverse mergers—about locating a public "shell" company for a reverse merger. Howells identified a reverse-merger candidate in April 2011. The candidate—Malibu Club Tan ("MCT")—was a publicly traded company that had operated a now-defunct tanning salon in Salt Lake City.

---

provision in the notes that triggered the $32.8 million bonus payment to the noteholders.

Gilbertson wanted a shell company for the reverse merger with a small "float"—the number of shares tradeable immediately after the reverse merger. MCT had a relatively small float. Before the merger with Dakota Plains, MCT had about 640,000 shares of outstanding stock. Due to regulatory restrictions, all but 92,400 shares were "restricted," not freely tradeable until six months after a merger. Another 127,200 shares were tradeable, but only with a legal opinion verifying certain requirements. All outstanding shares of Dakota Plains stock were restricted and not tradeable until six months after a merger. Thus, the only shares tradeable in the first six months after the reverse merger—and, critically for Gilbertson, during the first 20 days of public trading—were 219,600 MCT shares (the "tradeable MCT shares").

The same day Gilbertson proposed the note consolidation and reverse merger (in October 2011), he texted Howells that he was ready to move forward with the reverse merger. During the negotiations with Howells, Gilbertson insisted that 50,000 of the tradeable MCT shares be sold to a buyer of Gilbertson's choice before the merger. He also insisted that Howells keep this transaction "strictly confidential," allegedly to "help with the market," *e.g.*, prevent current stockholders from selling after the merger and driving down the stock price.

In November 2011, MCT and Dakota Plains agreed to the reverse merger. By December 2011, Howells had located MCT stockholders willing to sell a total of 50,000 of the tradeable MCT shares. MCT's attorney requested that Gilbertson sign a formal agreement prohibiting the sale of any of the 50,000 shares within 90 days after the merger to avoid "unduly influenc[ing] the market." Gilbertson refused, instead offering an unwritten "gentleman's agreement" that the shares would not be sold within 90 days after the merger.

Rather than purchase the 50,000 shares in his name, Gilbertson chose Doug Hoskins, a Minnesota real estate agent who played on and managed Gilbertson's polo team. Hoskins had no experience trading stock and no knowledge of Dakota Plains'

business. Additionally, Hoskins owed tens of thousands of dollars in judgments and tax liens. Gilbertson negotiated the details of the sale. Hoskins never met nor communicated with Howells or the MCT stockholders; all communications went through Gilbertson. Unbeknownst to Howells or the MCT stockholders, Gilbertson wired Hoskins $30,000 to purchase the shares. That same day, Gilbertson texted Howells that the "Wire for share purchases will go out tomorrow . . . as always please keep transactions strictly confidential."

Gilbertson also arranged for Hoskins to open a trading account at a brokerage firm specializing in penny stocks. Opening the account, Hoskins falsely represented himself "under penalty of perjury" as a sophisticated investor. He also made false representations in the share-purchase agreement (which Gilbertson edited), including that he was: (1) an "accredited investor;" (2) purchasing stock for himself only and not in concert with any other person or entity; and (3) not insolvent.

The reverse merger closed on March 22, 2012. That same day, Hoskins used Gilbertson's money to purchase 50,000 of the tradeable MCT shares for $0.50 per share.[3] Nothing in the merger documents referenced the stipulation allowing Gilbertson to purchase 50,000 of the tradeable MCT shares.

The first day of public trading on a "over-the-counter" market was March 23. In the first 30 minutes of trading, Gilbertson and Hoskins spoke by phone twice. Between these calls, Hoskins called his broker. That morning, Hoskins began selling his newly acquired shares for around $12 per share.

At the same time Gilbertson was directing Hoskins on selling, he also was directing Nicholas Shermeta, a stock broker at a Minneapolis securities brokerage firm,

---

[3]Of the 50,000 tradeable MCT shares Hoskins purchased, 14,000 were completely unrestricted and 36,000 were tradeable with a legal opinion.

to buy Dakota Plains stock for $12 per share. Gilbertson and Shermeta had a longstanding financial and personal relationship. In Dakota Plains' early years, Shermeta found investors for the company in return for cash and stock. Shermeta, with the help of an attorney from Dakota Plains, hid his financial relationship with the company from his brokerage firm and customers, in violation of federal securities regulations.

Shermeta testified that "right before or after the stock was publicly trading" Gilbertson instructed him to find buyers of Dakota Plains stock for $12 per share. Gilbertson provided no rationale for the $12 purchase price; when Shermeta asked, Gilbertson responded only that "$12 is the number." Gilbertson also told Shermeta that he had other buyers who would buy the stock for $12 or higher.

On the first day of public trading, at Gilbertson's direction, Shermeta purchased 10,000 shares of Dakota Plains stock. The second day, again at Gilbertson's direction, Shermeta purchased another 50,000 shares for $12 per share.

For the next 18 days, at Gilbertson's direction, Hoskins sold his stock for around $12 per share. During this time, he was the largest single seller of Dakota Plains stock, representing 32% of the total sales. Also during this time, and at Gilbertson's direction, Shermeta purchased the stock, both personally and on behalf of his brokerage clients (without their permission or knowledge) for around $12 per share. According to Shermeta's trial testimony, many of these purchases did not make financial sense for his clients,[4] but Shermeta made them anyway "at the direction of

[4]For example, Shermeta purchased 1,000 shares of Dakota Plains stock for $12 per share on behalf of his client Kim Culp, without Culp's knowledge. Culp already owned over 200,000 shares of Dakota Plains stock acquired for less than $0.50 per share. Also, at Gilbertson's direction "[t]o continue to stabilize or have the shares trade at $12 a share," Shermeta purchased 1,000 shares of Dakota Plains stock for himself, despite already owning over 100,000 shares he received for free.

Mr. Gilbertson to establish a share price of $12 a share." During this time, Shermeta was the largest single buyer of Dakota Plains stock, representing almost 54% of the total purchases.

On April 4, Hoskins emailed his broker asking why he had only "25pct of the volume" of transactions in Dakota Plains stock. At about the same time, Gilbertson texted Howells a similar message: "Hoskins should be getting more than 25pct of the volume." Hoskins and Gilbertson were both in Sarasota, Florida when they sent their messages.

At trial, Howells testified that when he received Gilbertson's April 4th text message, he was "concerned," in a "little bit of panic" because he knew it was "market interference." Gilbertson confirmed this, texting a bit later, "They would be participating on sales at 7 bucks not 12 were it not for my involvement." Howells understood this text message to mean "[t]hat through just sheer cavalier arrogance and activity that [Gilbertson] was manipulating the buy side and was asking me to manipulate the sell side." Despite Gilbertson's manipulation, Howells called Hoskins' broker and relayed Gilbertson's complaint. At trial, Howells testified he manipulated the sell side because he "had a large personal investment, pretty much most of my liquid net worth," in Dakota Plains, and he "chose to protect that." He also testified he was unaware that a bonus payment was tied to the price of the stock, and thus "failed to see any bigger picture on why this was going on, other than to potentially get a few extra dollars on a couple of trades for a friend and associate of his."

The average price of stock during the first 20 days of trading was $11.63, triggering almost $33 million in bonus payments to noteholders (about $11 million to Gilbertson alone). After the first 20 days of trading, Gilbertson stopped directing Shermeta to buy the stock, and the price "went down significantly." Hoskins continued trying to sell it. But by May, he had no buyers at $10 a share, and trading "basically stop[ped]."

Around May 15, 2012, Howells learned about the bonus payment through the Dakota Plains quarterly SEC report. He testified he was livid and scared because he "did the wrong thing, and it had cascading consequences beyond my imagination." He immediately emailed Gilbertson: "What institution will touch [Dakota Plains] with this derivative nonsense. The whole valuation of the company just went to shit; call me as I am walking into a hornets nest in the morning." Howells testified he held Gilbertson "responsible for the inclusion of the derivative piece" and his involvement in it. A few months later, Howells again confronted Gilbertson, explaining that "the nature of some of the communication and text messages and everything else . . . showed that [Howells] had an active role in things that happened in the market that [led] way to a derivative that [he] had no idea existed." Gilbertson responded by giving Howells 50,000 shares of Dakota Plains stock which he "legitimized" through fake consulting agreements.

Like Howells, Shermeta was not aware of the bonus payment. He first learned about it when an "irate" customer called him after reading the Dakota Plains quarterly SEC report. Shermeta testified he "had never seen anything like it and have never seen anything like it since." He felt angry and "used because clearly I was party to purchasing a stock at $12 so that this would, in effect, trigger this escalator clause in the notes." As Shermeta explained at trial, "you can see that the stock traded at $12 as a result of—at least partially a result of my trades."

In June 2012, Hoskins returned most of the unsold shares to Gilbertson through a sham polo contract. In it, Hoskins agreed to serve as a player and manager for Gilbertson's polo team and to transfer 25,000 shares of Dakota Plains stock "as compensation to the team for services provided." Hoskins sold his remaining shares throughout the rest of 2012 and into early 2013. Unlike his trading behavior during the first 20 days, however, Hoskins slowly and continually dropped his sales price to reflect market demand. He eventually sold shares for $4.50 a share.

Dakota Plains could not afford the bonus payments triggered by the reverse merger. The board tried to renegotiate or reduce the payments. Gilbertson refused. At Gilbertson's suggestion, the company tried to raise money for the payments. These efforts were unsuccessful. Dakota Plains ultimately declared bankruptcy.

In March 2018, Gilbertson was charged in a 22-count indictment with 15 counts of wire fraud, one count of conspiracy to commit securities fraud, and six counts of securities fraud. Hoskins, a co-defendant, was charged with nine counts of wire fraud, one count of conspiracy to commit securities fraud, and six counts of securities fraud. The jury convicted Gilbertson of all but one count. The jury convicted Hoskins of two counts of wire fraud, one count of conspiracy to commit securities fraud, and three counts of securities fraud. Gilbertson moved for judgment of acquittal or a new trial, arguing the evidence was insufficient. The district court denied the motion, finding "ample evidence to support the jury's verdict." *United States v. Gilbertson*, 2018 WL 5920625, at *3 (D. Minn. Nov. 13, 2018).

II.

Gilbertson believes his "convictions should be reversed because his conduct was not manipulative as a matter of law." He argues that the "government has no legally valid theory of market manipulation" because all his actions were "legitimate trades executed at the prevailing market price, which injected no inaccurate information into the marketplace." This court reviews the sufficiency of the evidence de novo, viewing the evidence most favorably to the verdict. *See United States v. Jenkins*, 758 F.3d 1046, 1049 (8th Cir. 2014). This court will affirm unless "there is no interpretation of the evidence that would allow a reasonable jury to find the defendant guilty beyond a reasonable doubt." *United States v. Cacioppo*, 460 F.3d 1012, 1021 (8th Cir. 2006).

Gilbertson was convicted under securities and wire fraud statutes that criminalize fraudulent or manipulative schemes. *See* **15 U.S.C. § 78j(b)** (prohibiting

"any manipulative or deceptive device or contrivance" "in connection with the purchase or sale of any security registered on a national securities exchange"); **18 U.S.C. § 371** (criminalizing a conspiracy to "defraud the United States, or any agency thereof"); **18 U.S.C. § 1343** (prohibiting "any scheme or artifice to defraud" by "false or fraudulent pretenses, representations, or promises").

Courts have interpreted these statutes broadly. For example, this court has held that the crime of wire fraud is "broad in scope." *United States v. Bishop*, 825 F.2d 1278, 1280 (8th Cir. 1987). "The fraudulent aspect of the scheme to 'defraud' is measured by a nontechnical standard." *Id.* In fact, a scheme to defraud does not require false representations. Rather, it is "a departure from fundamental honesty, moral uprightness, or fair play and candid dealings in the general life of the community." *United States v. Britton*, 9 F.3d 708, 709 (8th Cir. 1993). "[M]any courts have construed the term 'scheme or artifice to defraud' to include . . . widely diverse schemes," *United States v. States*, 488 F.2d 761, 764 (8th Cir. 1973), including stock manipulation. *See, e.g.*, *United States v. Clark*, 717 F.3d 790, 807 (10th Cir. 2013) (upholding wire fraud conviction against defendant who "engaged in coordinated selling to inflate the sales price of stock"); *United States v. Haddy*, 134 F.3d 542, 544-45 (3d Cir. 1998) (upholding wire fraud conviction based on stock manipulation scheme); *United States v. Russo*, 74 F.3d 1383, 1394 (2d Cir. 1996) (upholding mail fraud conviction against defendants who were "motivated by an intent to subvert the operation of normal market forces on the price of the stock rather than by legitimate investment concerns").

In the context of securities fraud, the Supreme Court held that the word "manipulative" is "virtually a term of art when used in connection with securities markets. It connotes intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199 (1976). "The Supreme Court has long construed [15 U.S.C. § 78j(b)] 'not technically and restrictively, but flexibly to effectuate its remedial

purposes.'" ***Lewis v. Scottrade, Inc.***, 879 F.3d 850, 853 (8th Cir. 2018), *quoting **SEC v. Zandford***, 535 U.S. 813, 819 (2002). "The gravamen of manipulation is deception of investors into believing that prices at which they purchase and sell securities are determined by the natural interplay of supply and demand, not rigged by manipulators." ***Gurary v. Winehouse***, 190 F.3d 37, 45 (2d Cir. 1999).

At trial, the jury heard and believed ample evidence that Gilbertson created a scheme to defraud through stock manipulation. Gilbertson laid the foundation for this scheme months in advance. He first convinced the Dakota Plains board to issue promissory notes with a bonus payment provision, drafted by him and inserted into the notes at his direction. This payment provision entitled him to a multimillion dollar bonus payment if the stock traded above $2.50 per share during the first 20 days of trading. As the government's securities expert testified, this provision created "a tremendous incentive to manipulate" the stock price.

Next, Gilbertson arranged and coordinated the reverse merger. He selected the shell company based on the number of freely tradeable shares. He then amassed control over a majority of them. He concealed his motive for acquiring these shares, telling Howells he wanted them to "help with the market" and prevent existing shareholders from selling and driving down the price. Through Hoskins, he also concealed his payment for and control over the shares. This was an essential part of his scheme, allowing him to drive up the stock price without revealing his role in the manipulative trading. He lied again when he entered into an unwritten "gentleman's agreement" not to trade shares within 90 days after the reverse merger. As the district court said, all of this created a "golden opportunity" for Gilbertson to control the market and manipulate the stock price. ***Gilbertson***, 2018 WL 5920625, at *1.

Finally, Gilbertson used his control over the shares to execute his fraudulent scheme. Although Hoskins purchased the stock for $0.50 per share the day before public trading began, Gilbertson directed him to sell it for $12 during the 20 days that

-11-

followed. At the same time, he directed Shermeta, to "have investors lined up to purchase shares of the stock" for $12 per share. These purchases did not reflect the underlying value of Dakota Plains stock; rather, Shermeta made them "at the direction of Mr. Gilbertson to establish a share price of $12 a share."

Gilbertson asserts his acts were not fraudulent because his trades "communicated no inaccurate information to the market." According to him, he did not manipulate the price of Dakota Plains stock; it was set by natural market forces. Relying on *GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189 (3d Cir. 2001) and *ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007), he argues his acts were not manipulative because he engaged in legitimate open-market trading.

In *GFL Advantage Fund*, the plaintiff alleged a company engaged in short selling to drive down stock prices for unlawful gains. The district court granted summary judgment to the company, concluding that "evidence of GFL's short sales alone was insufficient" to establish market manipulation because there was nothing "to suggest that the short sales were part of a scheme to manipulate the market." **GFL Advantage Fund**, 272 F.3d at 198. The Third Circuit agreed, noting that "courts must distinguish between legitimate trading strategies intended to anticipate and respond to prevailing market forces and those designed to manipulate prices and deceive purchasers and sellers." **Id.** at 205. Because the alleged manipulation consisted of short selling without any allegations of deceptive activity, the company's acts were legal. **Id.** at 207-09 (noting that "the market considered the stocks to be overvalued and that GFL simply was responding to market forces, rather than distorting them, by engaging in short sales").

Similarly, in *ATSI Communications*, a corporation filed a securities fraud action alleging that investors defrauded it into selling convertible preferred securities to entities they controlled. **ATSI Commc'ns**, 493 F.3d at 93-96. The district court dismissed the action. **Id.** at 98. The Second Circuit affirmed, concluding that "[t]o be

-12-

actionable as a manipulative act, short selling must be willfully combined with something more to create a false impression of how market participants value a security." *Id.* at 101. Because ATSI pled "no particular connection between the negative reaction of the stock price and anything the defendants did," the district court properly dismissed the complaint. *Id.* at 103-04.

Unlike these cases, Gilbertson was not engaged in "legitimate trading strategies intended to anticipate and respond to prevailing market forces." *GFL Advantage Fund*, 272 F.3d at 205. Rather, he took multiple acts to manipulate prices and distort market forces on both the buy and sell side. Initially, he asked Howells to keep his purchase of 50,000 of the tradeable MCT shares "strictly confidential." Then, instead of buying Dakota Plains stock in his name, he lied about his payment for and control over the shares, using Hoskins as his nominee. To facilitate the sale, he directed Hoskins to lie on his brokerage-account application and share-purchase agreements. He then entered into a fraudulent "gentleman's agreement" not to trade the shares.

When trading began, Gilbertson told Hoskins—the largest single seller of Dakota Plains stock during the initial 20-day period—to sell the shares at a certain price. And notably, rather than buy shares himself in the open market, he instructed Shermeta—the largest single purchaser of Dakota Plains stock during the initial 20-day period—to purchase stocks for $12 per share. These acts and omissions, taken together, do not constitute legitimate trading that responds to market forces. Rather, they show manipulation of prices and markets. *See Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 477 (1977) ("nondisclosure is usually essential to the success of a manipulative scheme" in the context of securities fraud).

Two witnesses (Howells and Shermeta) provided evidence of this manipulation on both the buy and sell side, testifying that "at Gilbertson's direction, they worked in concert with Gilbertson (Howells on the sell side, Shermeta on the buy side) to inflate the price of Dakota Plains stock." *Gilbertson*, 2018 WL 5920625, at *3. As the

-13-

district court properly found, this "evidence alone gave the jury a sufficient basis to find that Gilbertson schemed to inflate the stock price, engaged in deceptive conduct and active concealment, and acted with intent to defraud." *Id.*

Gilbertson disagrees, asserting that "the stock was already trading at $12 when Shermeta and Hoskins executed trades at that price." But this ignores that the majority of sales and purchases during the 20-day period were executed at prices dictated by Gilbertson. In fact, Gilbertson acknowledges he was responsible for the $12 per share price, texting Howells on April 4th that the stock would be selling at $7 per share rather than $12 "were it not for my involvement." Thus, even if this court assumes he did not manipulate the market to *set* the $12 price, he certainly manipulated the market—secretly directing stock sales and purchases—to *maintain* it. *See ATSI Commc'ns*, 493 F.3d at 100 (holding that deception occurs when "investors are misled to believe that prices at which they purchase and sell securities are determined by the natural interplay of supply and demand, not rigged by manipulators" (internal quotation mark omitted)); *GFL Advantage Fund*, 272 F.3d at 207 (holding that to prove fraud, the defendant must be "engaged in deceptive or manipulative conduct by injecting inaccurate information into the marketplace or creating a false impression of supply and demand for the security"); *United States v. Regan*, 937 F.2d 823, 829 (2d Cir. 1991) (holding that a plan to lower stock prices by secretly selling 40,000 shares to a broker dealer without disclosing to the dealer the identity of the seller or the moving party behind the deal "fits comfortably" within the range of "wrongful acts" Congress meant to prohibit in regulating securities).

The evidence was sufficient for a reasonable jury to find that Gilbertson's conduct was fraudulent and manipulative within the meaning of the statutes in question.

III.

Gilbertson argues the government failed to establish "nondisclosure of a material fact," or "active concealment of a material fact." Again, this court reviews the sufficiency of the evidence de novo. *See Jenkins*, 758 F.3d at 1049.

The district court instructed the jury that for purposes of wire fraud, a "scheme to defraud" requires evidence that Gilbertson was "employing material falsehoods, concealing material facts, or omitting material facts." Similarly, the court instructed the jury that for purposes of securities fraud, "a manipulative or deceptive device" requires evidence of "a deliberate affirmative misstatement of a material fact" or "deliberate omission of a material fact." Gilbertson believes the "government failed to identify any actionable omission or act of concealment, much less a material one."

From the beginning of his scheme, Gilbertson omitted, concealed, and lied about multiple facts. Initially, he lied about his payment for and control of the shares. He entered into a fraudulent "gentleman's agreement" not to trade them. He directed Hoskins to lie on his brokerage-account application and share-purchase agreements. He told Howells to keep the transaction "strictly confidential." And he instructed Shermeta to purchase stock for $12 per share rather than purchasing it himself.

Gilbertson argues these representations are immaterial. But, as the district court instructed the jury, a representation is material "if it has a natural tendency to influence or is capable of influencing the decision of a reasonable person in deciding whether or not to engage in a particular transaction." *See Neder v. United States*, 527 U.S. 1, 16 (1999) ("In general, a false statement is material if it has a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed." (internal quotation marks omitted)); *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (holding that materiality requires "a substantial likelihood

-15-

that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available").

At the very least, Gilbertson's active concealment of his purchase and control of 50,000 tradeable MCT shares—by directing Howells to keep the transaction "strictly confidential" and purchasing the shares in Hoskins' name—was material. *See Santa Fe Indus.*, 430 U.S. at 477 ("nondisclosure is usually essential to the success of a manipulative scheme" in the context of securities fraud); *United States v. Steffen*, 687 F.3d 1104, 1114 (8th Cir. 2012) (defining active concealment as "deceptive acts or contrivances intended to hide information, mislead, avoid suspicion, or prevent further inquiry into a material matter"). In fact, it was at the core of his scheme. Gilbertson was able to use the tradeable MCT shares to manipulate the stock price only because he did not buy or sell them in his name. As the district court correctly found, "the jury could easily find that a reasonable investor would have found material the fact that a corporate insider had, through a nominee, purchased more than half of the freely tradeable stock and was directing that nominee and others to trade the stock at pre-arranged prices for the purpose of triggering tens of millions of dollars in bonus payments that would likely cripple the corporation."

The evidence was sufficient to show nondisclosure or active concealment of a material fact.

IV.

Gilbertson maintains the district court abused its discretion in admitting lay opinion testimony on manipulation from a government witness. "A district court's decision to admit or exclude lay opinion testimony is reviewed for abuse of discretion." *United States v. Oslund*, 453 F.3d 1048, 1059 (8th Cir. 2006). "A district court has wide discretion in ruling on the admissibility of proffered evidence." *Harris v. Secretary, U.S. Dep't of the Army*, 119 F.3d 1313, 1321 (8th Cir. 1997). Evidentiary

-16-

rulings are overturned only if there is "a clear and prejudicial abuse of discretion." ***Haynes v. American Motors Corp.***, 691 F.2d 1268, 1272 (8th Cir. 1982). If a defendant did not object to the testimony at trial, this court reviews for plain error. *See* ***United States v. Pirani***, 406 F.3d 543, 549 (8th Cir. 2005) (en banc). Under plain error review, this court reverses only if there was an error, that was plain, that affected the defendant's substantial rights, and that "seriously affects the fairness, integrity, or public reputation of judicial proceedings." ***Id.*** at 550, *quoting* ***United States v. Olano***, 507 U.S. 725, 732 (1993).

Gilbertson objects to three opinions Howells gave during trial about text messages the two exchanged on April 4th. Gilbertson objected to only one of these opinions at trial. First, asked about his reaction to Gilbertson's text message complaining that "Hoskins should be getting more than 25pct of the volume," Howells testified he was "concerned" because Gilbertson was engaging in "market interference" in a manner inconsistent with the "gentleman's agreement" not to trade in the 90 days after the reverse merger. Gilbertson objected. Second, Howells testified to relaying Gilbertson's message about the 25% volume to Hoskins' broker, admitting that he was "manipulating the sell side." Gilbertson did not object. Third, Howells explained his interpretation of Gilbertson's texts to mean that Gilbertson "was manipulating the buy side" and asking Howells to "manipulate the sell side." Gilbertson did not object.

A lay witness may offer opinion testimony that is "rationally based on the witness's perception." **Fed. R. Evid. 701(a)**. "Personal knowledge or perceptions based on experience is sufficient foundation for lay testimony." ***United States v. Smith***, 591 F.3d 974, 982 (8th Cir. 2010) (internal quotation marks omitted). Lay witnesses may offer their interpretations of their conversations. *See, e.g.*, ***United States v. Lomas***, 826 F.3d 1097, 1106-08 (8th Cir. 2016) (holding that a lay witness may offer an opinion about the meaning of a conversation if the witness participates in it); ***United States v. Fregoso***, 60 F.3d 1314, 1326 (8th Cir. 1995) ("Where a witness is in a position to know what the other party meant, a district court does not abuse its

discretion in admitting testimony as to her understanding of the meaning of the words used by the other party." (cleaned up)).

Relying on *United States v. Scop*, 846 F.2d 135 (2d Cir. 1988), Gilbertson argues the district court allowed Howells to state "improper legal conclusions" that Gilbertson engaged in "market interference." This argument is without merit. In *Scop*, a government expert (SEC investigator) testified without personal knowledge to his conclusion that there was a scheme to defraud. ***Scop***, 846 F.2d at 138. Basing his opinion solely on trial evidence, the investigator opined that "certain individuals were active and material participants" in a stock manipulation scheme. ***Id.***

Here, however, Howells was not an expert witness opining on the legal significance of Gilbertson's acts. Rather, he was a lay witness testifying from personal experience about his interpretation of text message conversations with Gilbertson. In the first opinion, Howells properly explained his reaction to a text from Gilbertson, noting that he was "concerned" because he believed the text showed that Gilbertson was attempting to interfere with the market. *See **Lomas***, 826 F.3d at 1106-07 ("A lay witness is permitted to express an opinion that is rationally based on his perception, and helpful to determining a fact in issue." (cleaned up)). In the second and third opinions, Howells testified about his own participation in criminal conduct, telling the jury what he did—manipulate the sell side—to help Gilbertson. This was not an opinion on the legal significance of Gilbertson's acts. Rather, it was Howells's account of his own bad acts. To the extent Howell's testimony incriminated Gilbertson—indicating that Gilbertson manipulated the buy side—it still was not improper or unfairly prejudicial. ***United States v. Thompson***, 708 F.2d 1294, 1298 (8th Cir. 1983) (holding that a witness's conclusion that the defendant was involved in the charged conspiracy was admissible under Rule 701); ***United States v. McClintic***, 570 F.2d 685, 690 (8th Cir. 1978) (holding no abuse of discretion in allowing co-conspirator to offer his opinion that defendant was aware that goods were obtained by fraud). Rather, Howells was again properly opining about his understanding of

Gilbertson's text messages.  *See **United States v. Scott***, 243 F.3d 1103, 1107 (8th Cir.2001) ("A district court does not abuse its discretion in admitting testimony by a witness with firsthand knowledge as to his understanding of words used by the defendant or other conspirators.").

The district court did not abuse its discretion or plainly err in admitting Howells's testimony.

V.

Gilbertson contends the district court erred in imposing restitution "based on non-criminal conduct."  He also believes the court violated his constitutional rights in determining his restitution and sentence.  Sentencing courts have "wide discretion" in awarding restitution.  ***United States v. Carpenter***, 841 F.3d 1057, 1060 (8th Cir. 2016).  "The government has the burden of proving the amount of restitution by a preponderance of the evidence." ***United States v. Farrington***, 499 F.3d 854, 860 (8th Cir. 2007). This court reviews the decision to award restitution for an abuse of discretion, and the factual determinations underlying it for clear error.  ***Id.***

In fraud cases, "victim restitution may be ordered for criminal conduct that is part of a broad scheme to defraud, without regard to whether the defendant is convicted for each fraudulent act in the scheme." ***Id.*** at 861.  This court looks "to the scope of the indictment in order to determine whether it details a broad scheme encompassing transactions beyond those alleged in the counts of conviction." ***United States v. Manzer***, 69 F.3d 222, 230 (8th Cir. 1995) (internal quotation marks omitted).

The district court ordered Gilbertson to pay $15,135,361—the undisputed full amount that he and the other noteholders obtained from Dakota Plains due to Gilbertson's scheme. Gilbertson argues the district court erred in ordering this because there was no "connection between those losses and the alleged criminal conduct."

Specifically, he contends that losses incurred from non-criminal conduct (the inclusion of the bonus payment provision in the Consolidated Notes) cannot be included in the restitution calculation. The district court disagreed, finding that "every penny" of the bonus payment was the result of Gilbertson's fraudulent scheme "because the reverse-merger bonus provision itself was part of that scheme." It said:

> At the time that Mr. Gilbertson set out upon his criminal scheme, only the junior notes contained a bonus provision, and that bonus provision applied only in the case of an initial public offering. As part of his scheme, Mr. Gilbertson went behind the company's back to make preliminary arrangements for a reverse merger, and then he induced the company to alter the bonus provision so that [it] would apply to both the senior and junior notes, and so that it would apply in the event of a reverse merger. It is clear from the evidence at trial that these steps were taken with criminal intent and in furtherance of the fraudulent scheme. In other words, but for Mr. Gilbertson's fraudulent scheme, he would not have been entitled to any bonus, because none of the notes would have entitled the noteholder to a bonus in the event of a reverse merger.

The district court did not clearly err in finding that the insertion of the bonus payment provision in the Consolidated Notes was part of Gilbertson's fraud scheme. The indictment alleged, and the trial evidence showed, that Gilbertson's acts before the reverse merger—including his insertion of the bonus payment provision in the Consolidated Notes—albeit legal, were part of his fraud scheme. That Gilbertson later illegally manipulated the stock after the reverse merger does not render earlier acts outside the scope of the scheme. As the district court rightly found, Gilbertson inserted the bonus payment provision as part of his scheme to defraud Dakota Plains. Without it, he would have received no bonus at all, regardless of the stock price. *See, e.g.*, *Farrington*, 499 F.3d at 860-61; *Manzer*, 69 F.3d at 230.

Finally, Gilbertson argues that the district court erred in relying on facts not found by a jury beyond a reasonable doubt in increasing his sentence and ordering

restitution. As Gilbertson notes, this court has rejected this argument. *See, e.g.*, *United States v. Thunderhawk*, 799 F.3d 1203, 1209 (8th Cir. 2015) (rejecting the argument that restitution is a "criminal punishment beyond the statutory maximum and therefore must be proved to a jury").

The district court did not abuse its discretion in ordering restitution in the amount of $15,135,361.

\* \* \* \* \* \* \*

The judgment is affirmed.

KELLY, Circuit Judge, concurring.

I agree that sufficient evidence supported Gilbertson's convictions, and that the district court did not abuse its discretion by ordering restitution. I write separately, however, because in my view, the lay testimony about market "manipulation" and "interference" was improperly admitted.

Gilbertson argues that it was error to admit certain testimony from Thomas Howells, a lay witness for the government. Gilbertson takes issue with three discrete portions of Howells's testimony where he told the jury that he and Gilbertson were engaged in "market interference" by "manipulating" the market for Dakota Plains stock. Gilbertson argues this testimony amounted to improper legal conclusions that were unhelpful to the jury. See Fed. R. Evid. 701(b).

Gilbertson objected the first time Howells testified about "market interference." The district court overruled that objection, and Howells immediately went on to discuss "market manipulation." Although Gilbertson did not again object, he re-asserted his objection to all of Howells's "interference and manipulation" testimony during a bench

conference. Gilbertson moved to strike Howells's disputed testimony as impermissible legal opinions and requested a curative instruction to the jury. The district court denied Gilbertson's motion because it "didn't remember [Howells] giving legal opinions." Because Gilbertson made a contemporaneous objection to Howells's "market interference" testimony and moved for a curative instruction, the district court "clearly had an opportunity to correct any error it may have made." See United States v. Moeckly, 769 F.2d 453, 460 (8th Cir. 1985). Under these circumstances, the issue is preserved for appellate review. See id.

Gilbertson does not challenge Howells's testimony under Rule 701(a)—he acknowledges that Howells testified based on his "perception" of their conversations. See Fed. R. Evid. 701(a) (lay witness opinion must be "rationally based on the witness's perception"). Nor does Gilbertson challenge Howells's testimony as being inculpatory or linking Gilbertson to the crimes. Instead, Gilbertson challenges Howells's testimony under Rule 701(b), as not helpful to the trier of fact. See Fed. R. Evid. 701(b) (lay witness opinion must be "helpful to clearly understanding the witness's testimony or to determining a fact in issue").

I agree with Gilbertson that the disputed portions of Howells's testimony amounted to improper legal conclusions and thus were not sufficiently helpful to the jury to be admissible. See Kostelecky v. NL Acme Tool/NL Indus., Inc., 837 F.2d 828, 830 (8th Cir. 1988) (explaining that "evidence that merely tells the jury what result to reach is not sufficiently helpful to the trier of fact to be admissible"). Howells impermissibly used legal terms matching the elements of the charged offenses to explain the significance of his and Gilbertson's conduct. The disputed testimony was "phrased in terms of inadequately explored legal criteria" and "merely t[old] the jury what result to reach." See Fed. R. Evid. 704 advisory comm. note; Kostelecky, 837 F.2d at 830.

Howells could, of course, testify about his and Gilbertson's involvement in the criminal conduct. See United States v. Thompson,708 F.2d 1294, 1298 (8th Cir. 1983) (permitting an alleged co-conspirator to testify that the defendant was "involved" in the charged conspiracy; that this testimony "went directly to the ultimate issue in the case . . . did not make [it] improper"); see also Fed. R. Evid. 704 (so long as it is otherwise admissible, an "opinion is not objectionable just because it embraces an ultimate issue"). Similarly, Howells could testify about his own "observations and perceptions" about Gilbertson and describe for the jury the activities he, Gilbertson, and the others engaged in, and their purpose for doing so. See e.g., United States v. Lomas, 826 F.3d 1097, 1107 (8th Cir. 2016) (affirming the admission of lay witness testimony that the defendant used the word "tool" in a text message to mean "gun" because the witness testified based on her "direct observations and perceptions"); Fed. R. Evid. 701(a).

What Howells could not do is cloak impermissible legal conclusions in lay opinion testimony. Here, Howells used the term market "manipulation," which has "a separate, distinct, and special legal meaning." See Hogan v. Am. Tel. & Tel. Co., 812 F.2d 409, 411 (8th Cir. 1987). As we explained in Hogan, "[o]pinion testimony is not helpful to the factfinder if it is couched as a legal conclusion." Id. (citing Owen v. Kerr-McGee Corp., 698 F.2d 236, 240 (5th Cir. 1983) (holding that a question that calls for a legal conclusion supplies the jury with no information other than what the witness believes the verdict should be)). In Hogan, we decided the district court erred by allowing lay witnesses to tell the jury that they had observed the defendant engage in "discriminatory acts." Id. Because the term "discriminate" has specialized legal meaning, it was improper for the lay witnesses to use that term. Id. at 412; see also United States v. Ness, 665 F.2d 248, 249–50 (8th Cir. 1981) (affirming the exclusion of lay witness testimony that the defendant had "intent to injure or defraud the bank" because this was "an essential element of the crime" and "the jury could easily accord too much weight to the pronouncement of a lay witness unfamiliar with the standards erected by the criminal law").

-23-

Likewise, here, Howells opined that he and Gilbertson had engaged in market "manipulation." That legal term of art matches the elements of the charged offenses and has a specialized meaning. See Santa Fe Indus., Inc. v. Green, 430 U.S. 462, 476 (1977) (explaining that "manipulation" is "virtually a term of art when used in connection with securities markets"). The task of separating factual responses from impermissible legal conclusions "is not easy," but courts must exclude opinion testimony "if the terms used have a separate, distinct, and special legal meaning." Hogan, 812 F.2d at 411–12. In my view, it was improper for Howells, a lay witness, to use the disputed words at trial. See id.; Ness, 665 F.2d at 250.[5]

Despite an evidentiary error, we will not reverse if the error was harmless. United States v. Ramos, 852 F.3d 747, 757 (8th Cir. 2017). "An evidentiary error is harmless when, after reviewing the entire record, we determine that the substantial rights of the defendant were unaffected, and that the error did not influence or had only a slight influence on the verdict." Id. (cleaned up). Howells's use of "interference" and "manipulation" aside, the jury heard that Gilbertson coordinated the sale of Doug Hoskins's shares at $12 per share while also directing Nicholas Shermeta to buy at $12, in an effort to inflate the price of Dakota Plains stock. As the court explains in Part II of the opinion, this is evidence of market manipulation.

In addition, the government presented evidence that Gilbertson employed "material falsehoods" and "deliberate affirmative misstatements of material fact" in

---

[5]This is consistent with how other courts apply Rule 701(b). See, e.g., United States v. Scop, 846 F.2d 135, 140 (2d Cir. 1988) (rejecting testimony that the defendants' conduct constituted market "manipulation," a "scheme to defraud," and "fraud" because those opinions "invade the province of the court to determine the applicable law" and "could not have been helpful to the jury in carrying out its legitimate functions"); Torres v. Cty. of Oakland, 758 F.2d 147, 150 (6th Cir.1985) ("The problem with testimony containing a legal conclusion is in conveying the witness' unexpressed, and perhaps erroneous, legal standards to the jury.").

furtherance of his scheme, which supported the jury's verdicts on the wire-fraud and securities-fraud counts, respectively. For example, a reasonable jury could view Gilbertson's "gentleman's agreement" to not trade Hoskins's shares during the first 90 days as an "affirmative misstatement of material fact" made "[i]n connection with the purchase or sale of securities" and "designed to artificially inflate and manipulate the price of shares." See Final Jury Instructions, DCD 214; see also 15 U.S.C. § 78j(b). Not only was Gilbertson's statement false, it was material. Had MCT's lawyer, Leonard Burningham, known Hoskins would sell his shares during the first 90 days, Burningham likely would not have agreed to sell the shares to Hoskins, given his concern about undue market influence.

The government introduced additional evidence on the materiality of Gilbertson's lies. The jury heard that Dakota Plains investors were "incredibly angry" and "livid" upon learning about Gilbertson's scheme and Dakota Plains's subsequent $32.8 million liability. Multiple investors expressed their grave concerns about the effect that Gilbertson's scheme had on the company's financial stability. All of this evidence was independent of Howells's use of the terms market "interference" and "manipulation." As a result, this is not a case where the erroneous evidentiary ruling affected Gilbertson's substantial rights or had more than a "slight influence on the verdict." See Ramos, 852 F.3d at 757. I therefore agree that the district court's judgment should be affirmed.

_____

-25-